IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Trustee, successor-in-interest to BANK OF AMERICA, N.A., as Trustee, successor-in-interest to WELLS FARGO BANK, N.A., as Trustee, for the Registered Holders of CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES PASS-THROUGH CERTIFICATES, SERIES 2007-C4, | ) ) ) ) ) ) ) ) ) ) | |
| and | ) ) | |
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for the Registered Holders of the MEZZ CAP COMMERCIAL MORTGAGE TRUST 2007 C-5, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C5, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 15-3195 (consolidated) |
| SPRINGFIELD PRARIE PROPERTIES, LLC, an Illinois limited liability company; ROBERT W. EGIZII, an individual; MICHAEL EGIZII, an individual; RODNEY EGIZII, an individual; JODI BAPTIST, an individual; JOHN PRUITT, an individual; CLYDE BEIMFOHR, an individual; EEI HOLDING CORPORATION, an Illinois Corporation; and EGIZII PROPERTY MANAGERS, LLC, an Illinois limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

<u>OPINION</u>

RICHARD MILLS, United States District Judge:

Pending is the Plaintiffs' motion for partial summary judgment.

## I.    PROCEDURAL BACKGROUND

On June 29, 2015, Plaintiffs U.S. Bank National Association, as Trustee,

successor-in-interest to Wells Fargo Bank, N.A., as Trustee, for the Registered

Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial

Mortgage Pass-Through Certificates, Series 2007-C4 ("A Note Holder"), and U.S.

Bank National Association, as Trustee of the Registered Holders of the Mezz Cap

Commercial Mortgage Trust 2007-C5, Commercial Mortgage Pass-Through

Certificates, Series 2007-C5 ("B Note Holder," or collectively "Plaintiffs") filed a

companion lawsuit against Londrigan, Potter & Randle, P.C. ("Londrigan"), Perkins

Coie LLP ("Perkins"), Scott & Scott, P.C. ("Scott") and Sgro, Hanrahan, Durr &

Rabin, LLP ("Sgro," and collectively "Law Firms"), as Case Number 15-cv-3195,

seeking injunctive relief and later asserting claims under the Illinois Fraudulent

Transfer Act ("UFTA) and for common law aiding and abetting and civil conspiracy,

relating to transfers of Property that Springfield Prairie Properties, LLC ("the

Borrower") and Robert Egizii, two of the Defendants, made to the Law Firms.

The next day, the Plaintiffs filed a Complaint featuring the counts at issue here in Case Number 15-cv-3199, seeking to enforce the Notes and Guaranty against the Borrower and Egizii, to pierce the corporate veil to impose direct liability against certain remaining Defendants, and to impose liability against various Defendants under UFTA and for common law conspiracy and tortious interference. On December 16, 2015, the two cases were consolidated.

Before filing the two cases in federal court, the Plaintiffs filed a foreclosure lawsuit in state court, Case Number 2014-CH-456 in Sangamon County Circuit Court ("the Foreclosure Case"). The foreclosure case does not seek personal recourse liability against the Borrower or Egizii. A foreclosure judgment has been entered.

The Plaintiffs' motion for partial summary judgment is directed against the Borrower on Count I and Robert W. Egizii on Count IV.

The facts of this case are mostly undisputed.

## II.    FACTS

A. <u>Loan documents</u>

On or about June 4, 2007, the Borrower received a $21,920,000 commercial Loan ("the A Loan") from Column Financial, Inc. ("Column"). To evidence and secure its payment obligations under the A Loan, Borrower caused to be executed

and delivered certain loan documents to Column ("the A Loan Documents") which include without limitation the following (each dated June 4, 2007 unless otherwise noted):

a. *Promissory Note (A Note)* ("the A Note");
b. *Mortgage, Security Agreement and Fixture Financing Statement* recorded June 6, 2007 as Document No. 2007R02766 in Christian County ("the Christian County Mortgage");
c. *Mortgage, Security Agreement and Fixture Financing Statement* recorded June 6, 2007 as Document No. 2007R20123 in Sangamon County ("the Sangamon County Mortgage" and together with the Christian County Mortgage, "the Mortgages"); and
d. *Indemnity and Guaranty Agreement* ("Guaranty") executed by Egizii.

On or about June 4, 2007, the Borrower also received a $1,420,000 commercial loan ("the B Loan," and together with the A Loan, "the Loan" or "Loans") from Column. To evidence its obligations under the B Loan, Borrower caused to be executed and delivered to Column a *Promissory Note (B Note)* dated effective as of June 4, 2007 ("the B Note," and together with the A Note, "the Notes"). The B Note is further secured by the Mortgages and certain A Loan Documents. The Note, A Loan Documents and other documents executed and delivered in connection with the Loans are hereinafter referred to as "the Loan Documents."

B. <u>Assignment</u>

The A Loan and A Loan Documents were assigned to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4 ("Wells Fargo as Trustee"), by virtue of certain documents including, but not limited to, the following:

a. *Allonge to Promissory Note (A Note)* affixed to the Note;

b. *Assignment of Mortgage Security Agreement and Fixture Financing Statement* dated February 20, 2008 and recorded March 10, 2008 as Document No. 2008R01165 in Christian County;

c. *Assignment of Mortgage, Security Agreement and Fixture Financing Statement* dated February 20, 2008 and recorded March 17, 2008 as Document No. 2008R11182 in Sangamon County; and

d. *General Assignment.*

The A Loan and A Loan Documents were further assigned to Bank of America, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4 ("Bank of America as Trustee"), by virtue of certain documents including, but not limited to, the following:

a. *Allonge* affixed to the Note;

b. *Assignment of Mortgage, Security Agreement and Fixture Financing Statement* dated June 30, 2009 and recorded September 28, 2009 as Document No. 2009R05520 in Christian County;

c. *Assignment of Mortgage, Security Agreement and Fixture Financing Statement and Assignment of Assignments of Leases and Rents* dated June 30, 2009 and recorded December 1, 2009 as Document No. 2009R54382 in Sangamon County; and

d. *Omnibus Assignment*.

The A Loan and A Loan Documents were subsequently assigned to the A Note Holder by virtue of certain documents including, but not limited to, the following:

a. *Allonge* affixed to the Note;

b. *Assignment of Mortgage Security Agreement and Fixture Financing Statement and Assignment of Assignment of Leases and Rents* dated April 23, 2013 and recorded May 1, 2013 as Document No. 2013R01846 in Christian County;

c. *Assignment of Mortgage Security Agreement and Fixture Financing Statement and Assignment of Assignment of Leases and Rents* dated April 23, 2013 and recorded April 29, 2013 as Document No. 2013R13887 in Sangamon County; and

d. *Omnibus Assignment*.

The B Note was assigned to the B Note Holder. The allonges accomplishing this assignment are affixed to the B Note. Through these assignments, the A Note is currently held by the A Note Holder. The B Note is currently held by the B Note Holder and the balance of the Loan Documents are currently held by the A Note Holder for the benefit of Plaintiffs.

The Plaintiffs are in possession, custody or control of the original Notes. Legal counsel for Borrower has examined the original Notes at the offices of Plaintiffs' legal counsel and is aware that Plaintiffs are in possession of them.

C. Events of default

Under the Loan Documents, it is an Event of Default if "any sum payable under this Note is not paid on or before the date such payment is due." Payments are due "on the eleventh (11th) day of each and every month through and including June 11, 2017."

The Borrower failed to make the scheduled Loan payment when due on October 11, 2012, pursuant to the A Note and B Note. Borrower failed to make the scheduled Loan payments called for under the A Note and B Note each month after October 2012, although it did later make certain partial payments to Plaintiffs not specifically contemplated by either of the Notes.

The Plaintiffs allege that Borrower's failure to make payments of the amounts due on the Notes constitutes an Event of Default under the Loan Documents.

D. Demand letter and acceleration of Loan's maturity

 On March 28, 2013, the Plaintiffs sent a formal notice of default to

Borrower and Egizii notifying them that Plaintiffs were electing to accelerate the maturity of the Loan and demanding payment in full ("the Demand Letter"). The Plaintiffs contend that, as a result of the Events of Default described above, the Plaintiffs had the right under the Note to accelerate the maturity of the Loan, based on the language in § 1.4 of the Notes:

> Upon the occurrence of an Event of Default, the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, shall, at the option of the Lender and without notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated Mature Date.

In the Demand Letter, the Plaintiffs also: (a) advised Borrower and Egizii that all Rents and Cash Collateral (as defined in the Demand Letter) were Plaintiffs' collateral under the terms of the Loan Documents and that they could not use the Rents and Cash Collateral to pay their attorneys in connection with the default (as such payments would not be ordinary and necessary expenses of operations for the Property); and (b) demanded that all rents and Cash Collateral be delivered to the Plaintiffs. Despite the Demand Letter, neither the Borrower nor Egizii have repaid the Loan.

The language in § 3.7 of the Mortgages provides that Borrower agreed to pay the Plaintiffs' legal fees on demand:

Borrower shall pay on demand all of Lender's expenses reasonably incurred in any efforts to enforce any terms of this Mortgage . . . including, but not limited to, reasonable legal fees and disbursements . . . together with interest thereon from and after the date incurred by Lender until actually paid by Borrower at the Default Interest Rate (as defined in the Note), and the same shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

E. <u>Borrower's diversion and transfer of rent</u>

The Borrower received rents, issues, profits and revenues from the real estate described in the Mortgages (including the proceeds thereof, "Rents") after, or that were applicable in the period after, October 11, 2012. Borrower's sole source of income was the Property.

In the midst of continued settlement talks among the parties, during the period of July 17, 2013 and December 24, 2014, Borrower delivered or caused to be delivered to Londrigan more than $1 million to be held in a client trust account in Borrower's name ("the Londrigan Trust Account").

Between July 26, 2013 and November 5, 2014, Borrower delivered or caused to be delivered to Scott more than $2 million to be held in a client trust account in Borrower's name ("the Scott Trust Account" and, together with the Londrigan Trust Account, "the Trust Accounts").

On or about September 24, 2014, the Borrower delivered or caused to be delivered to Scott a security retainer or retainers in the amount of $150,000, using funds from the Trust Accounts. On or about December 19, 2014, Borrower delivered or caused to be delivered to Londrigan a security retainer in the amount of $150,000, using funds from the Trust Accounts.

On or about September 24, 2014, the Borrower delivered or caused to be delivered to Perkins an advance payment retainer or retainers in the aggregate amount of $100,000, using funds from the Trust Accounts. Between September 19, 2013 and June 13, 2017, Borrower delivered or caused to be delivered to Sgro an advance payment retainer or retainers in the aggregate amount of $150,000, using funds from the Trust Accounts.

On February 28, 2014, the Borrower authorized Scott to distribute the aggregate amount of $416,225.48 from the Scott Trust Account to various individuals, purportedly relating to those individuals' membership or other interests in Borrower. On May 30, 2014, the Borrower authorized Scott to distribute the aggregate amount of $196,915.92 from the Scott Trust Account to various individuals, purportedly relating to those individuals' membership or other interests in Borrower.

On September 10, 2014, Borrower authorized Scott to distribute the aggregate amount of $95,619.24 from the Scott Trust Account to various individuals, purportedly relating to those individuals' membership or other interests in Borrower. Borrower did not have the prior written consent of the Plaintiffs for the deliveries into the Trust Accounts, or the distributions, retainers, and payments paid from those Trust Accounts, described in the preceding paragraphs.

The Borrower and Robert Egizii allege that all attorney's fees referenced in the Plaintiffs' motion and paid for by the Borrower were incurred by the Borrower and its individual members in this case, in the state court lawsuit or in related settlement negotiations. The Plaintiffs dispute this allegation and claim that Borrower and Egizii admit that Borrower paid attorney's fees on behalf of other Defendants, Egizii Property Managers, LLC and EEI Holding Corporation, two separate legal entities who hold no actual or constructive ownership in the Borrower. Specifically, Sgro represents those two entities. Sgro does not represent the Borrower or its individual members.

The Borrower and Egizii further contend that Section 18.5 of the Operating Agreement provides as follows:

> The Company shall indemnify, defend and save harmless each Member or former Member of the Company against expenses actually and reasonably incurred by such Member in connection with the defense of an action, suit or proceeding, civil or criminal, in which such Member is made a party by reason

or having been such Member, except in relation to matters as to which such Member shall be adjudged in the action, suit or proceeding to be liable for gross negligence or willful misconduct.

In 2013 and 2014, the members of Borrower Springfield Prairie Properties were as follows: (1) Marriot Commerce Building, LLC—30.7759%; (2) Fifth Street Partnership—16.6967%; (3) Egizii Family Limited Partnership—15.1176%; (4) Warehouse Partners, LLC—12.7422%; (5) Robert Egizii—12.0263%; (6) Bell Building, LLC—8.1798%; and (7) Marco Partnership III—4.4615%.

In 2013 and 2014, the constructive ownership of the Borrower was as follows: (1) Robert Egizii—53.740%; (2) Clyde Beimfohr—19.880%; (3) John Pruitt—9.550%; (4) Thomas Egizii—8.810%; (5) Rodney Egizii—3.933%; (6) Michael Egizii—2.473%; and (7) Jodi Baptist—1.613%

F. <u>Language pertaining to recourse liability</u>

Although the Notes are largely nonrecourse (i.e., the lender can foreclose on and otherwise receive its collateral, but it cannot obtain a personal recourse judgment against the borrower and guarantor), they each contain language providing for recourse against Borrower under certain circumstances. Section 1.5 of the Notes provides in part that Borrower is personally liable to the Plaintiffs for the full amount due under the Loan if Borrower transfers any Property without Plaintiffs' consent:

Notwithstanding anything to the contrary in this Note or any of the other Loan Documents. . . (Y) all such indebtedness evidenced by the Note and all the other obligations of Borrower under the Loan Documents shall be deemed fully recourse to Borrower in the event that. . . (iii) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage.

The Notes define "Property" to include "all properties (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents." Under the Mortgages, Borrower "GRANTS A SECURITY INTEREST" in all "Property," as defined therein. The Mortgages define the "Property" to include "all rents, royalties, issues, profits, bonus money, revenue, income, rights and other benefits (collectively, the "Rents" or "Rents and Profits") of the Land or the Improvements," along with other real and personal property.

The Guaranty at (l) incorporates the language in the Notes by reference, providing that Egizii is personally liable for the full amount of the Loan under the same circumstances as Borrower:

**INDEMNITOR ACKNOWLEDGES THAT PHASE (Y) IN SECTION 1.5 OF EACH OF THE NOTES DESCRIBES CIRCUMSTANCES WHEREIN THE ENTIRE INDEBTEDNESS EVIDENCED BY SUCH NOTE AND THE OTHER OBLIGATIONS OF BORROWER UNDER THE LOAN DOCUMENTS WOULD BECOME FULLY RECOURSE TO BORROWER. IF SUCH CIRCUMSTANCES SHOULD OCCUR THEN INDEMNITOR SHALL ADDITONALLY BE DIRECTLY AND PRIMARILY LIABLE, ON A JOINT AND**

13

**SEVERAL BASIS, FOR THE ENTIRE INDEBTEDNESS EVIDENCED BY THE NOTE AND FOR ALL OF BORROWER'S OBLIGATIONS UNDER THE LOAN DOCUMENTS AND SUCH INDEBTEDNESS AND OBLIGATIONS SHALL BE INCLUDED WITHIN THE TERM "COSTS" HEREUNDER.**

Robert W. Egizii acknowledges that Guaranty includes the above language but asserts that the Guaranty contains additional language in Paragraph 1(e) which contradicts the Plaintiffs' quoted language. Paragraph 1(e) provides:

**RENTS, ISSUES, PROFITS AND REVENUES OF ALL OR ANY PORTION OF THE PROPERTY WHICH ARE NOT EITHER APPLIED TO THE ORDINARY AND NECESSARY EXPENSES OF OWNING AND OPERATING THE PROPERTY OR PAID TO LENDER BUT ONLY TO THE EXTENT SUCH RENTS, ISSUES, PROFITS AND REVENUES ARE RECEIVED OR APPLICABLE TO A PERIOD AFTER EITHER AN "EVENT OF DEFAULT" (AS DEFINED IN <u>SECTION 2.1</u> OF THE MORTGAGE) OR NOTICE FROM LENDER THAT AN EVENT OR CIRCUMSTANCE HAS OCCURRED WHICH, WITH THE PASSAGE OF TIME OR GIVING OF FURTHER NOTICE OR BOTH, WOULD CONSTITUTE SUCH AN EVENT OF DEFAULT.**

The Borrower and Robert Egizii allege that in or about February 2014, the accounting firm of Pehlman & Dold, P.C. advised the Borrower to distribute $416,255.48 to its individual members to pay income taxes incurred by the Borrower and allocated to the individual tax members for tax year 2013. Additionally, they allege that in or about May 2014, Pehlman & Dold advised the Borrower to distribute $196,915.92 to its individual members to pay estimated income taxes incurred by the Borrower and allocated to the individual members for first quarter 2014. The Borrower and Egizii further allege that in or about September 2014, Pehlman and

Dold advised the Borrower to distribute $95,619.24 to its individual members to pay estimated income taxes incurred by the Borrower and allocated to the individual members for second quarter 2014.

The Promissory Notes, Mortgages, Indemnity and Guaranty Agreement and all other loan documents were drafted by the original lender, Column Financial, Inc.

G. Affirmative defenses, the foreclosure case and judgment

The Plaintiffs filed the Foreclosure Case in state court.  As part of the Foreclosure Case, a receiver was appointed over the Property on December 23, 2014.

The Borrower asserted as its sole affirmative defense in the Foreclosure Case that Plaintiffs lacked standing because they were not the property owners and holders of the Notes and Mortgages due to alleged defects in the assignment documents.  In this action, the Borrower and Egizii assert identical Affirmative Defenses that, as Borrower argued in the Foreclosure Case, the Assignments are invalid and Plaintiffs lack standing to pursue this action because of alleged deficiencies in the Assignments.  They also point to various problems with the signatures on the A and B Loans.

On June 13, 2017, the court in the Foreclosure Case issued a Judgment of *In Rem* Foreclosure and Sale.  The Foreclosure Judgment found, without limitation, that Plaintiffs are the "owner and holder of the Notes and Mortgages aforesaid."

The Foreclosure Judgment found that the amount due was the sum of (i) on the A Loan, $31,902,226.45, plus $6,420.54 per day in interest after December 11, 2016; (ii) on the B Loan, $2,587,785.73, plus $673.28 per day in interest after December 11, 2016; (iii) attorney's fees and costs; and (iv) any advances permitted by Plaintiff under the Loan Documents after December 11, 2016.

## III. DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See id.*

B. <u>Notes and Guaranty and Default</u>

If a note's signatures are admitted, "a plaintiff producing the instrument is entitled to payment" if the plaintiff is a holder under or nonholder in possession of the instrument who has the rights of a holder, *see* 810 ILCS 5/3-301, "unless the defendant proves a defense or claim in recoupment." 810 ILCS 5/3-308. A plaintiff's attachment of the note to the complaint provides prima facie evidence that plaintiff is the holder. *See Bayview Loan Servicing, LLC v. Cornejo*, 2015 IL App. 140412, 39 N.E.3d 68, 72 (3d Dist. 2015). To enforce a guaranty under Illinois law, a plaintiff establishes a prima facie case when it "enters proof of the original indebtedness, the debtor's default and the guarantee." *Mid-City Indus. Supply Co. v. Horwitz*, 132 Ill. App.3d 476, 483 (1st Dist. 1985).

The Borrower executed the Notes and Egizii executed the Guaranty. The Borrower and Egizii admit that Borrower failed to make the scheduled loan payments beginning on October 11, 2012. The failure to make any such payment is a default. The Loan has not been repaid in full.

The Plaintiffs attached copies of the Notes and Guaranty to their Complaint. Moreover, the Plaintiffs attached copies of all assignment documents to their Complaint. The chain shows an unbroken line of ownership tracing from the original lenders, to the Plaintiffs, through various intermediate holders. The Plaintiffs have

the original Notes in their possession (currently held by Plaintiffs' counsel). The Borrower's counsel has seen the original Notes.

The Plaintiffs have shown that Borrower and Egizii have signed the Notes and Guaranty, that Plaintiffs hold the Loan and that the Loan is in default. The question becomes whether the Defendants have established a defense.

C. <u>Terms of the Notes and Guaranty and contract interpretation</u>

(1)

In interpreting a contract, "the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 241 Ill.2d 428, 441 (2011). The first step in determining the intent of the parties is to consider the language of the contract. *See id*. The contract must be viewed as a whole, with each provision considered in light of the other provisions. *See id*. Courts should not view a clause or provision in isolation or examine detached portions of the contract in determining intent. *See id*.

When the words are clear and unambiguous, they must be given their plain and ordinary meaning. *See id*. If the language can be susceptible to more than one meaning, it is ambiguous. *See id*. If contract terms are ambiguous, courts can consider extrinsic evidence to determine the parties' intent. *See id*.

If the words are not "reasonably susceptible to more than one meaning," the contract is not ambiguous. *See id*. at 443. A contract is not ambiguous simply because the parties disagree on its meaning. *See id*.

The Plaintiffs contend that Borrower and Egizii are personally liable under the clear and unambiguous terms of the Notes and Guaranty. The Borrower and Egizii dispute that and allege the Plaintiffs' interpretation of section 1.5(Y) of the Notes contradicts section 1.5(e) of the Notes and, therefore, full recourse liability is not triggered.

The Plaintiffs rely largely on *Bank of America, N.A. v. Freed*, 2012 IL. App. 110749, 983 N.E.2d 509 (1st Dist. 2012). In *Freed*, the Illinois Appellate Court upheld an over $200 million judgment against a guarantor pursuant to a "carve-out" provision, or springing recourse obligation, because of a specific action. *See id*. at 510. The applicable portion of the contract in *Freed* stated that if the "borrowers 'contest, delay or otherwise hinder any action' taken by the Bank in connection with the appointment of a receiver or in hindrance of the foreclosure, the guarantors are liable for the full amount of the loan." *Id*. at 518. The court found this provision was neither vague nor ambiguous and, because the defendants had contested the appointment of a receiver which resulted in a delay that reached 341 days before the appeal eventually concluded, the carve-out provision was enforceable given that "by

taking those actions [defendants] forfeited their exemption from liability for full repayment of the loan." *See id*. at 518, 521.

Although the Illinois Appellate Court observed there was a dearth of controlling precedent on the issue, the court examined cases from around the country in finding that carve-out provisions in loan agreements are enforceable in certain circumstances. *See id*. at 518-21. For example, in *CSFB 2001-CP4-Princeton Park Corporate Center, LLC v. SB Rental I, LLC*, 410 N.J. Super. 114, 980 A.2d 1 (2009), the New Jersey Superior Court enforced a $13.3 million guaranty after the borrower had taken out a $400,000 junior mortgage, without first having obtained the plaintiff's written consent as required by a carve-out clause that provided the otherwise nonrecourse obligation would become a full recourse loan under those circumstances. *See id*. at 3. The court in *Freed* also cited *G3-Purves Street, LLC v. Thompson Purves, LLC*, 953 N.Y.S.2d 109, 114 (N.Y. App. Div. 2012), wherein the court held that a carve-out provision which allowed for the recovery of actual damages incurred by the lender did not constitute an unenforceable penalty.

In *Federal Deposit Insurance Corp. v. Prince George Corp.*, 58 F.3d 1041 (4th Cir. 1995), the note generally limited the borrower's liability upon foreclosure but provided there was "no limitation of liability or recourse" in the event the holder's "rights of recourse to the property . . . subject to the Mortgage are suspended, reduced or impaired by or as a result of any act, omission or

misrepresentation" of borrower. *See id*. at 1044. The borrowers defaulted on the loan and eventually filed a bankruptcy petition. *See id*. at 1045. Following the bankruptcy stay, the holder of the note foreclosed and brought an action for deficiency judgment based on the carve-out provision. *See id*. The Fourth Circuit determined that, even though the borrower had a statutory right to file for bankruptcy, its decision to do so was an "act" resulting in the lender's right to foreclose being "suspended, reduced or impaired" that resulted in the guarantor being fully liable. *See id*. at 1046-47.

Additionally, in *111 Debt Acquisition Holdings, LLC v. Six Ventures, Ltd*., 413 F. App'x 824 (6th Cir. 2011), the Sixth Circuit considered whether a springing recourse event was triggered when a provision stated the debt would be fully recourse if "any Guarantor consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause . . . or fails to contest" the bankruptcy filing. *See id*. at 830. The court determined that, because one of the guarantors filed a bankruptcy petition, the debt was fully recourse under the plain language of the loan documents, notwithstanding the fact that other guarantors had contested the bankruptcy filing. *See id*.

The Plaintiffs also rely heavily on *Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*, 477 F. Supp.2d 366 (D. Mass. 2007). In *Blue Hills*, the district court in Massachusetts considered a provision of the guaranty which provided that the

"guarantor shall be liable for the full amount of the Debt in the event the . . . Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage." *Id*. at 381. The guarantor received settlement proceeds of $2,000,000 and sent those funds to its legal counsel to hold in its client trust fund. *See id*. at 370. The guarantor never notified the lender of the receipt of the funds. *See id*. The court found that because the guarantor failed to obtain written consent before transferring the settlement proceeds, it violated the applicable provisions of the guaranty and, as a result, the individuals who created the guarantor were "jointly and severally liable in their individual capacities under the guaranty for the full amount of the deficiency." *See id*. at 381-82. The Plaintiffs contend that the springing resource obligation in this case is nearly identical to that in *Blue Hills* and should likewise be enforced in determining the Borrower and Egizii are liable.

*Blue Hills* is a District Court of Massachusetts case which obviously is not controlling in the Central District of Illinois. The Defendants note there are some factual differences between *Blue Hills* and this case. Unlike in *Blue Hills*, the Borrower here did not actively hide the funds from the lenders. However, *Blue Hills* is instructive simply because the court enforced a springing recourse obligation with similar language to that in this case. The court determined that, because the borrower did not obtain permission before transferring settlement proceeds, it was liable for

the full amount of the deficiency pursuant to the springing recourse language of the guaranty in *Blue Hills*.  The court's decision was not based on any improper acts or bad faith on the part of the borrower.

The Plaintiffs claim that the Mortgage precluded the Borrower from owning assets other than the Property or engaging in any business other than the ownership, management and operation of the Property.  Moreover, the Borrower's delivery of Rents to the Law Firms constitutes a transfer, under the normal dictionary or statutory definition of "transfer."  The Plaintiffs further allege it is any "transfer" of "Property" which triggers recourse under section 1.5(Y).

The Plaintiffs did not consent to the transfers in advance.  Moreover, the Plaintiffs allege "Rents" constitute "Property" based on the definition in the Mortgages.  In its previous Opinion and Order on the Defendants' motions to dismiss, the Court concluded that "a lender may obtain a judgment for the full amount of a debt if that full liability is triggered by the borrower's failure to pay rents to the lender, given that such obligations are enforceable and the lender is not seeking to collect rents directly from the tenants."  *See* Doc. No. 28, at 43-44.

The Borrower and Egizii allege that Plaintiffs' interpretation of section 1.5(Y) of the Notes—that any transfer of any funds, whether before or after a default, without the prior written consent of the Plaintiffs triggers full recourse liability--

contradicts the language of section 1.5(e) of the Notes. They allege that, pursuant to section 1.5(e), if after a default the Borrower's revenues "are not either applied to the ordinary and necessary expenses of owning and operating the Property or paid to Lender," the Borrower is only liable for the specific amount of funds that were inappropriately used for other purposes. The corollary under the provision is that there can be no liability if the Borrower uses its revenue to pay the ordinary and necessary expenses of owning and operating real estate, whether or not the Plaintiffs have approved the payment of those ordinary and necessary expenses in writing. The Borrower and Egizii further contend the more specific provisions of section 1.5(e) contradict the Plaintiffs' interpretation of section 1.5(Y) and the specific provisions control over the general provisions. *See Whalen v. K-Mart Corp.*, 166 Ill. App.3d 339, 345 (1st Dist. 1988). Specifically, the language of section 1.5(e) directly contradicts the Plaintiffs' broad interpretation of section 1.5(Y) and, therefore, limits the application of section 1.5(Y). The Borrower and Egizii also allege *Blue Hills* did not involve any language similar to section 1.5(e), which serves to limit the circumstances under which full recourse liability can be triggered.

In reply, the Plaintiffs allege that section 1.5(e) of the Notes addresses the Plaintiff's recourse for Borrower's mere failure to deliver net Rents. Section 1.5(e) states:

> [N]otwithstanding the foregoing provisions of this section, Borrower shall be fully and personally liable and subject to legal action as follows . . . (e) for rents, issues, profits and revenues of all or any portion of the Property which are not either applied to the ordinary and necessary expenses of owning and operating the Property or paid to the Lender but only to the extent such rents, issues, profits and revenues are received or applicable to a period after either an Event of Default or notice from Lender that an event or circumstances has occurred which, with the passage of time or giving of further notice or both, would constitute an Event of Default.

Counts II and III of the complaint address the Plaintiffs' recourse for Borrower's failure to deliver net Rents pursuant to section 1.5(e). The Plaintiffs claim that if Borrower had merely left the money in its operating account, this would have been the extent of relief sought by Plaintiffs.

The Plaintiffs' request for relief here is about Borrower's action in taking the additional step of transferring the Rent proceeds beyond Plaintiffs' reach as a creditor. If a borrower pays all of the rent proceeds to its owners or other parties, a lender's judgment against the borrower is virtually worthless because the proceeds are no longer in the borrower's account to be garnished. The Plaintiffs contend this is why section 1.5(Y) exists which makes the loan recourse if the Borrower transfers collateral without approval. If a borrower's consequences are the same whether it leaves funds in its account or diverts them, the borrower would have little incentive not to make it more difficult for the lender to collect over owners and related parties. The Plaintiffs contend this is entirely reasonable.

The Borrower and Egizii allege that section 1.5(e) provides that Borrower has no liability for post-default transfers of funds that are used to pay the ordinary and necessary expenses of owning and operating the property, such as the payment of retainers and attorney's fees to the Law Firms, which they allege constitute ordinary and necessary expenses of owning and operating the Borrower's real estate. The Affidavit of Robert W. Egizii is attached to the response, which states that all attorney's fees paid by the Borrower were incurred by the Borrower and its individual members in this case, in the state court lawsuit or in related settlement negotiations. They also attach the Rule 26 Written Report of Donald Wright, CPA, which states that legal expenses incurred in instituting or defending lawsuits which arise out of, or are directly connected with the business, are considered ordinary and necessary expenses. Additionally, the Borrower's Operating Agreement states that legal expenses incurred in defending the individual members of Springfield Prairie Properties constitute ordinary and necessary expenses.

The Borrower also admits to distributing funds to its individual members. However, these distributions were made so that income taxes on the Borrower's net income, which are passed through to the individual members as required under limited liability company taxation, could be paid by the individual members. Attached to its response are the Borrower's tax returns for 2013. The Borrower and Egizii allege that payment of such taxes, as ordinary and necessary expenses of

owning and operating the real estate, is specifically allowed under section 1.5(e) of the Notes.

The Borrower and Egizii cite the opinion of Donald Wright that it is common practice for business entities which pass through their income for taxation at the ownership level, such as limited liability companies, to distribute funds to their members in order to pay the income taxes allocated to them and that it is common practice to calculate such distributions for the payment of income taxes based on the highest federal and state income taxes. Accordingly, based on the Borrower's 2013 net income of $860,032, the amount of $416,255.48 was distributed to the individual members based on the applicable tax rate of 48.4%. Distributions were also made to the individual members to pay the Borrower's taxes in 2014. All of the distributions were made based on the advice of Pehlman & Dodd.

The Borrower and Egizii allege it is absurd to interpret the loan documents to mean that full recourse liability is triggered unless every cent generated by the Borrower is paid to the Plaintiffs or spent with the Plaintiffs' prior written consent. They further claim that even if Plaintiffs could show that the entire amount of the challenged transfers was not used for ordinary and necessary expenses under section 1.5(e), the extent of the Borrower's liability for such inappropriate transfer would be limited to the specific amount of the transfer. The Plaintiffs have no right to a full recourse judgment because of misappropriated funds under section 1.5(e).

In reply, the Plaintiffs note Borrower transferred more than $3 million to Scott and Londrigan to hold in their Trust Accounts. After Plaintiffs demanded the turnover of the funds, Scott and Londrigan refused and claimed that Plaintiffs had no right to the funds. The Trust Accounts were then used to fund advance payment retainers to Sgro and Perkins. The Borrower also caused Scott to distribute more than $700,000 to Borrower's constructive members to pay income taxes. The Plaintiffs contend that any assertion that Borrower retained complete control and ownership of the funds shows why the loan goes from nonrecourse to recourse.

The Plaintiffs reiterate that sections 1.5(e) and 1.5(Y) both apply due to the facts of the case because the Borrower both failed to deliver the net Rents to Plaintiffs (recourse for the amount of net Rents) and transferred Property (recourse for the full debt). The provisions address different concerns and can trigger without the other. Only section 1.5(e) would trigger if the Borrower failed to deliver net post-default Rent proceeds in its operating account to Plaintiffs. Only section 1.5(Y) would trigger if Borrower transferred proceeds. Section 1.4(a) of the Notes allows the Plaintiffs to pursue both remedies simultaneously, stating the "remedies of Lender in this Note or in the other Loan Documents, or at law or in equity, shall be cumulative and concurrent[.]"

The Plaintiffs claim that Borrower's and Egizii's proposed interpretation is unreasonable because it impermissibly reads section 1.5(Y)—and section 1.4(a)—out of the Notes.

Additionally, the Plaintiffs contend that even if section 1.5(e)'s limitation were read in to section 1.5(Y), the Borrower and Egizii would still be liable for the full debt because the undisputed transfers are not ordinary and necessary expenses of owning and operating real estate.  Significantly, the Borrower was not a solvent entity that was meeting its obligations as they became due.  The Plaintiffs contend different rules apply when the Borrower is not operating in the ordinary course of business.  Illinois law prohibits insolvent entities, like Borrower, from distributing money to members.  *See* 805 ILCS 180/25-30(a).

The Plaintiffs next allege Borrower's legal expenses paid out of the Law Firms' Trust Accounts were not incurred in the ordinary course of business.  The extraordinary circumstance of the Borrower's default had occurred.  The Plaintiffs further claim the legal expenses were incurred largely to defend Borrower and Egizii from personal liability claims.  The Plaintiffs contend those Defendants cannot explain how legal expenses to defend them from personal liability on Loans that are nonrecourse under most circumstances qualify as "ordinary and necessary expenses of owning and operating" real estate.

Additionally, some of the legal expenses were incurred by third parties and thus could not constitute "ordinary and necessary expenses." Sgro represents Egizii Property Managers and EEI Holding Corporation, not the Borrower or its constructive members. The Borrower's payment of legal fees incurred by the third party entities cannot qualify as "ordinary and necessary expenses" under any circumstances.

The Plaintiffs reiterate that the Loans are recourse if an unapproved transfer occurs. Under section 1.5(Y), it does not matter if the funds were used to pay ordinary and necessary expenses. The Plaintiffs note (1) a transfer occurred, (2) the transfer was of Property and (3) Plaintiffs approved the transfer in writing in advance. The Plaintiffs further claim that Borrower and Egizii have admitted that after the Loans went into default, (A) Rents are part of the definition of "Property" in the Mortgages; (B) Borrower delivered Rents to the Law Firms, directed use of those Rent proceeds to pay legal retainers (including for entities who are neither the Borrower nor its constructive members), and had the Rent proceeds disbursed to Borrower's constructive members; and (C) Plaintiffs did not approve these acts in advance. Section 1.5(e) is an entirely different part of the Notes. Under section 1.5(Y), full recourse springs if transfers occurred and were not approved. The Borrower and Egizii admit there were transfers without approval, which is all the Notes require.

Upon considering the language of the contract as whole, the Court concludes there is nothing in section 1.5(e) that conflicts with or contradicts section 1.5(Y). They are separate provisions addressing different situations. Section 1.5(Y) specifies that all indebtedness is fully recourse if the Borrower does not obtain consent before assigning, transferring or conveying the Property, as required by the Mortgage. Section 1.5(e) does not require an affirmative act of assigning, transferring or conveying the Property. This provision would apply if the Borrower fails to apply rents to the ordinary and necessary expenses of owning and operating the Property or pay rents to Plaintiffs after Default, resulting in recourse for the amount of net rents. There is nothing which precludes the Plaintiffs from seeking relief under either provision. Moreover, Section 1.4(a) of the Notes permits the Plaintiffs to pursue both remedies simultaneously.

Because "Rents" are included in the definition "Property" in the Mortgages, it is undisputed that the Borrower transferred Property without first obtaining the Plaintiff's consent. Under section 1.5(Y), it does not matter if the funds were used to pay the ordinary and necessary expenses of owning and operating the Property.

The Court does not believe this to be an absurd result. It is consistent with the language of the policy. It is also logical to have different consequences depending

on whether the funds remain in a borrower's account or are transferred, given that it would be more difficult for the lender to collect in the latter situation.

Even assuming that section 1.5(e)'s limitation also applied to section 1.5(Y), it is questionable whether the transfers would constitute ordinary and necessary expenses of owning and operating real estate given that the Borrower was not solvent at the time and thus was prohibited from distributing money to its members. Additionally, to the extent that expenses were incurred to defend Borrower and Egizii from personal liability claims on nonrecourse Loans, it is difficult to see how those would qualify as "ordinary and necessary expenses." The Borrower's payment of legal fees incurred by other entities who hold no actual or constructive ownership in Borrower also would not qualify as "ordinary and necessary expenses."

In any event, the Borrower transferred Rents, or Property, without obtaining approval in advance by the Plaintiffs. That is enough to trigger recourse under section 1.5(Y).

(3)

The Borrower and Egizii claim that Plaintiffs misinterpret section 1.5(Y) by ignoring the "as required by the Mortgage" language at the end of the provision, in addition to ignoring section 1.13 of the mortgages. They allege it is only if the mortgages require the Borrower to obtain the Plaintiffs' prior written consent for an

assignment, transfer or conveyance of the collateral that full recourse can be triggered under section 1.5(Y). Therefore, the language of the mortgages must be analyzed.

The only section of the mortgages that discusses required consents for the transfer of property is section 1.13, which states in relevant part:

> [I]n the event that the Property or any part thereof or interest therein shall be sold (including any installment sales agreement), conveyed, disposed of, alienated, hypothecated, leased (except to tenants of space in the Improvements in accordance with the provisions of Section 1.12 hereof), assigned, pledged, mortgaged, further encumbered or otherwise transferred or Borrower shall be divested of its title to the Property or any interest therein, in any manner or way, whether voluntarily or involuntarily, without the prior written consent of Lender being first obtained, which consent may be withheld in Lender's sole discretion, then the same shall constitute an Event of Default and Lender shall have the right, at its option, to declare any or all of the indebtedness secured hereby, irrespective of the Maturity Date, immediately due and payable.

The Borrower and Egizii contend that, given the terminology used (installment sales, conveyance, disposal, alienation, hypothecation, leasing, assignment, pledges, mortgages, encumbrances, divesting of title), it is apparent that section 1.13 relates to tangible real and personal property, and not money. They note that the language "or otherwise transferred" is a catchall provision and the word "transfer" can be broadly defined as alleged by Plaintiffs. Under the doctrine of *ejusdem generis*, "where general words follow particular and specific words in a statute, the general words must be construed to include only things of the same kind as those indicated

by the particular and specific words . . . unless there is something in the statute or its context which shows that the doctrine . . . should not be applied." *City of Chicago v. Ross*, 257 Ill. 76, 79 (1912). Accordingly, the Borrower and Egizii claim the language "or otherwise transferred" must be interpreted as relating to transfers of real estate so that it is consistent with the preceding particular and specific words relating to transfers of real estate.

In reply, the Plaintiffs allege that section 1.13 of the Mortgages broadly prohibits any Property transfer without prior written approval. They note the general usage of "property" broadly includes "everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal." Black's Law Dictionary 5th ed. The Plaintiffs contend that if the parties intended to limit its applicability to a subset of "Property," they would have used more specific terms such as "Land" or "Improvements." Additionally, most means of transfer listed in section 1.13 apply equally to intangible property. The Plaintiffs note that Borrower acknowledges that "rights," which are intangible interests that may be held in both tangible and intangible property, is one of the matters that can be transferred by the method in question.

The Plaintiffs further note that the Mortgage in the normal course of business authorizes many categories of operating expenses, such as insurance (section 1.4), real estate taxes (section 1.5), mechanics and materialmen (section 1.10), and

utilities (section 1.14), among others. The Borrower would thus be able to operate the Property in the normal course of business without separate written approval. However, the provisions do not authorize the types of post-default transfers here.

The Court concludes that "Property" as used in section 1.13 encompasses the net income (Rents) and proceeds of them, from being "conveyed," "disposed of" or "otherwise transferred." The means of transfer listed in section 1.13 can apply to intangible party. The Parties could have limited section 1.13 to real and tangible personal party but did not do so. The Court should not interpret the Mortgage in a manner that ignores the terminology used by the Parties. Accordingly, the "as required by the Mortgage" language in section 1.5(Y) does not preclude the Plaintiffs from seeking recourse.

(4)

The Borrower and Egizii claim the Plaintiffs' argument that Borrower's transfer of rental revenue without Plaintiffs' prior written consent triggers full recourse liability under section 1.5(Y) is simply absurd. They contend no one would agree to those terms. Such an interpretation is not commercially reasonable in that it would make the Borrower's management of the real estate practically impossible and would cause the Plaintiffs to be considered a mortgagee in possession.

Additionally, the parties could not have intended that full recourse liability would ensue whenever the Borrower transferred funds from one bank account to another, or even deposited funds into a bank account, without specific prior written consent from the lender. The Borrower and Egizii assert that Borrower's transfer of funds to client trust accounts at law firms is functionally no different than the transfer of funds to a bank account because the Borrower still retained control and ownership of the funds. They claim that such an absurd result cannot be followed.

In reply, the Plaintiffs reiterate that the Notes and Guaranty unambiguously and reasonably impose harsh consequences for the Borrower's unapproved transfers. They allege collateral transfers like this are particularly problematic in the context of a generally-nonrecourse loan because the lender has relinquished the right to recover from a wide range of accounts and property, in exchange for more certain recovery against specific collateral. There is nothing absurd about a nonrecourse loan becoming recourse upon the unapproved transfer of collateral.

The Plaintiffs further assert this is a straightforward matter of contract interpretation. The Borrower's assertion that it retained complete control and ownership of the funds shows why the recourse event exists.

The Plaintiffs note the Illinois Court of Appeals did not find it "absurd" or "draconian" to uphold a judgment in excess of $200 million based on the plain

language of a nonrecourse exception, when the obligor simply defended itself in litigation by contesting the appointment of a receiver. *See Freed*, 983 N.E.2d at 520-21. They allege the Defendants' conduct here was more egregious and that a straightforward application of section 1.5(Y) requires judgment in favor of Plaintiffs for the full debt.

It is the language of the contract that is important and section 1.5(Y) speaks for itself. *Freed* makes clear that full-recourse liability is appropriate upon the occurrence of a triggering event.

(5)

The Borrower and Egizii note that extrinsic evidence is required to resolve any ambiguous provisions in the loan documents. Therefore, if the Court determines there are two different, reasonable interpretations of the Notes and Mortgages relating to full recourse liability such that the Notes and Mortgages are ambiguous, summary judgment is inappropriate and the meaning of the ambiguous language must be decided on the basis of extrinsic evidence. *See Thompson*, 241 Ill.2d at 441. The Defendants cite the extrinsic evidence offered by the Borrower—the Affidavit of Robert W. Egizii—which clearly disputes the Plaintiffs' interpretation of the Notes and Mortgages. Egizii states that all attorney's fees paid by the Borrower were incurred by Borrower and its individual members in this case, in the state court

lawsuit or related settlement negotiations. Those attorney's fees are considered ordinary and necessary expenses of owning and operating the Borrower's real estate. The Borrower and Egizii claim this creates a genuine issue of material fact which precludes the entry of summary judgment.

The Plaintiffs allege the provisions must be enforced as written and without reference to extrinsic evidence or the after-declared subjective intent of the parties. The Notes and Mortgages are clear on their face and state that they encapsulate all agreements between the parties. Section 4.25 states in part, "This Mortgage and the other Loan Documents contain the entire agreements between the parties and supersede any prior agreements (oral or written)."

The Court is unable to find that there is any ambiguity of the Notes and Mortgages relating to full recourse liability. A contract is not ambiguous merely because the parties disagree on its meaning. *See Thompson*, 241 Ill.2d at 443. As the Court has stated, section 1.5(Y) and section 1.5(e) apply in different circumstances. Because the Notes and Mortgages are clear on their face, the Court need not resort to extrinsic evidence to interpret the documents.

(6)

Robert W. Egizii is a guarantor and contends he is not liable on that basis. Generally, a guarantor is a favorite of the law. *See Hensler v. Busey Bank*, 231 Ill.

App.3d 920, 926 (4th Dist. 1992). "A guarantor is to be accorded the benefit of any doubt which may arise from the language of the contract, and his liability is not to be varied or extended by construction or implication beyond its precise terms." *Id*. A guarantor generally can have no greater liability than the principal debtor. *See id*.

The contract language is the same for both Springfield Prairie Properties and Egizii. Because section 1.5(Y) is clear, the Court concludes that Egizii's status as a guarantor does not shelter him from liability.

(7)

In their reply, the Plaintiffs note that neither the Borrower nor Egizii address the Illinois Appellate Court's decision in *Freed* upholding a $200 million judgment pursuant to a springing recourse obligation, which was triggered by the debtors' opposition to the lender's receiver request and foreclosure. 983 N.E.2d at 520-21. In noting that it appeared to be an issue of first impression in Illinois, *see id*. at 519, the court expressly found that a carve-out provision in a loan contract is enforceable. *See id*.

Most of the other applicable cases are from other jurisdictions. Some—such as *Princeton Park*, *Thomson Purves*, *Prince George* and *Blue Hills Office Park*— are cited with approval by the Illinois Appellate Court in *Freed*. The cases stand for

the proposition that a nonrecourse obligation can become full recourse upon the occurrence of a triggering event.

Accordingly, Illinois and other jurisdictions enforce springing recourse obligations according to their terms. The Borrower under the Notes and Egizii pursuant to the Guaranty agreed they would be personally liable for the entire debt upon the Borrower's transfer of Property without Plaintiffs' consent and that did in fact occur. Accordingly, the Court concludes that full recourse springs pursuant to section 1.5(Y).

Ergo, the Plaintiffs' Motion for Partial Summary Judgment as to Liability on Counts I and IV [d/e 78] is GRANTED.

Partial summary judgment is entered in favor of Plaintiffs and against Defendant Springfield Prairie Properties, LLC as to Count I and against Defendant Robert W. Egizii as to Count IV, in the amount of $34,490,012.18;

Plus interest and advances from and after December 11, 2016 to the date of Judgment;

Plus Plaintiffs' attorney's fees in an amount to be determined;

Less a credit for any funds received by Plaintiffs relating to the Property from and after December 11, 2016;

Less a credit for the aggregate amount of the credit bid submitted by Plaintiffs, or the amount received by Plaintiffs following a bid by one or more third parties, at a foreclosure sale of the real estate described in the Mortgages.

ENTER: February 28, 2019

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge