IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CSMC 2007-C4 EGIZII PORTFOLIO LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| U.S. BANK NATIONAL ASSOCIATION, | ) | |
| as Trustee for the Registered Holders of | ) | |
| the MEZZ CAP COMMERCIAL | ) | |
| MORTGAGE TRUST 2007 C-5, | ) | |
| COMMERCIAL MORTGAGE PASS- | ) | |
| THROUGH CERTIFICATES, SERIES | ) | |
| 2007-C5, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 15-3195 |
| | ) | (consolidated) |
| SPRINGFIELD PRAIRIE PROPERTIES, | ) | |
| LLC, an Illinois limited liability company; | ) | |
| ROBERT W. EGIZII, an individual; THOMAS | ) | |
| EGIZII, an individual; MICHAEL EGIZII, an | ) | |
| individual; RODNEY EGIZII, an individual; | ) | |
| JODI BAPTIST, an individual; JOHN PRUITT, | ) | |
| an individual; PAMELA JOHNSON, | ) | |
| EXECUTOR OF THE ESTATE OF CLYDE | ) | |
| BEIMFOHR; EEI HOLDING | ) | |
| CORPORATION, an Illinois | ) | |
| Corporation; and EGIZII PROPERTY | ) | |
| MANAGERS, LLC, an Illinois limited | ) | |
| liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

RICHARD MILLS, United States District Judge:

This matter is before the Court following a bench trial.

1

The Court has reviewed the entire record, including the Parties' proposed findings of fact and conclusions of law, post-trial briefs, the exhibits and Court transcripts.

## I. BACKGROUND

### (A)

In 2007, Defendant Springfield Prairie Properties, LLC ("SPP" or "Borrower") took out two loans totaling $23,340,000 from Column Financial, Inc. to purchase seven properties. Six of the properties are located in the City of Springfield, Illinois and one is located in Pana, Illinois. The State of Illinois was the tenant in six of the buildings. Defendant EEI Holding Corporation ("EEI"), along with its divisions Egizii Electric, Inc. and BRH Builders, leased the premises located at 700 N. MacArthur until August 2015.

Defendant Egizii Property Managers ("EPM") managed the real estate owned by SPP. Defendant Robert W. Egizii is the primary stockholder of EEI, the majority member of EPM and SPP's majority member.[1] The original Lender was aware of the ownership structure of SPP, EPM and EEI when the loans were entered into in 2007.

---

[1] On October 27, 2020, Egizii filed a Suggestion of Bankruptcy [d/e 247]. Under 11 U.S.C. § 362(a), therefore, the proceedings are stayed against Egizii.

SPP's other members include Marriot Commerce Building, LLC, Fifth Street Partnership, Egizii Family Limited Partnership, Warehouse Partners, LLC, Bell Building, LLC and Marco Partnership III, and its managing partner is Springfield Prairie Properties, SPE, Inc.

Other Defendants include Egizii's family and friends who own the rest of the interests in EPM, EEI and SPP.  Michael Egizii (son) owns interests in all three. Rodney Egizii (son), who was dismissed after filing for bankruptcy, owned interests in all three.  Jodi Baptist (daughter) owned interests in all three.  Thomas Egizii (cousin) owned an interest in SPP.  John Pruitt and Clyde Beimfohr (since deceased and substituted by his Estate) owned interests in SPP.  These individuals were referred to as the Constructive Members.  They are the members of SPP's members.

The loans were commercial mortgage backed securities, CMBS loans.  The promissory notes and the mortgages securing the loans were signed by Robert Egizii, as president of SPP.  Egizii guaranteed the loan.  None of the other Defendants are signatories to the promissory notes, the mortgages or the Indemnity and Guaranty agreement.  The Loan documents were drafted by the Lender.  The Plaintiffs acquired the right to recover the Loan through a series of assignments.

The Loan documents also included the Operating Agreement of SPP, the Property Management Agreement between SPP and EPM, an organizational chart showing the members of SPP, various tenant estoppel certificates including one from

EEI, by which the tenant agreed to submit rents directly to the Lender if requested in the event of default.

The Indemnity Clause, Section 18.5 of the Operating Agreement, provides as follows:

> The Company shall indemnify, defend and save harmless each Member or former Member of the Company against expenses actually and reasonably incurred by such Member in connection with the defense of an action, suit or proceeding, civil or criminal, in which such Member is made a party by reason or being or having been such Member, except in relation to matters as to which such Member shall be adjudged in the action, suit or proceeding to be liable for gross negligence or willful misconduct.

The Indemnity Clause, ¶6 of the Property Management Agreement, provides:

> SPP agrees:
>
> ***
>
> (d)     To defend, indemnify, and save PM harmless from any and all damages, claims, suits, or costs, whether for personal injury or otherwise, arising out of PM's management of the Property whether such claims are filed or damages incurred before or after the termination of this Agreement.

The Loan documents contain no specific language prohibiting SPP from using pre-receivership rents to pay legal fees to defend itself after a default.

Paragraph 1.5(e) of the Notes allows for partial recourse, *i.e.*, recovery of rents, issues, profits and revenues derived from any portion of the Property which are not applied to the ordinary and necessary expenses of owning and operating the Property, if the rents or profits are received after an Event of Default.  It states:

> [N]otwithstanding the foregoing provisions of this section, Borrower shall be fully and personally liable and subject to legal action as follows . . . (e)  for

rents, issues, profits and revenues of all or any portion of the Property which are not either applied to the ordinary and necessary expenses of owning and operating the Property or paid to the Lender but only to the extent such rents, issues, profits and revenues are received or applicable to a period after either an Event of Default or notice from Lender that an event or circumstances has occurred which, with the passage of time or giving of further notice or both, would constitute an Event of Default.

Paragraph 1.5(Y) of the Notes provides in part that Lender may recover the full amount due under the Loan if Borrower transfers any Property without Plaintiffs' consent:

> Notwithstanding anything to the contrary in this Note or any of the other Loan Documents. . . (Y) all such indebtedness evidenced by the Note and all the other obligations of Borrower under the Loan Documents shall be deemed fully recourse to Borrower in the event that: . . . (iii) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage.

The Notes define "Property" to include "all properties (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents."  Under the Mortgages, Borrower "GRANTS A SECURITY INTEREST" in all "Property," as defined therein.  The Mortgages define the "Property" to include "all rents, royalties, issues, profits, bonus money, revenue, income, rights and other benefits (collectively, the "Rents" or "Rents and Profits") of the Land or the Improvements," along with other real and personal property.

Section 1.13 of the Mortgages make it an event of default to sell, convey or otherwise transfer the Property or any part thereof or interest therein without the Lender's consent:

> [I]n the event that the Property or any part thereof or interest therein shall be sold (including any installment sales agreement), conveyed, disposed of, alienated, hypothecated, leased (except to tenants of space in the improvements in accordance with the provisions of Section 1.12 hereof), assigned, pledged, mortgaged, further encumbered or otherwise transferred or Borrower shall be divested of its title to the Property or any interest therein, in any manner or way, whether voluntarily or involuntarily, without the prior written consent of Lender being first obtained, which consent may be withheld in Lender's sole discretion, then the same shall constitute an Event of Default and Lender shall have the right, at its option, to declare any or all of the indebtedness secured hereby, irrespective of the Maturity Date, immediately due and payable.

The Guaranty at (l) incorporates the language of ¶1.5(Y) in the Notes, providing that Egizii is personally liable for the full amount of the Loan under the same circumstances as Borrower:

> **INDEMNITOR ACKNOWLEDGES THAT <u>PHRASE (Y)</u> IN <u>SECTION 1.5</u> OF EACH OF THE NOTES DESCRIBES CIRCUMSTANCES WHEREIN THE ENTIRE INDEBTEDNESS EVIDENCED BY SUCH NOTE AND THE OTHER OBLIGATIONS    OF    BORROWER UNDER THE LOAN DOCUMENTS WOULD  BECOME    FULLY RECOURSE  TO  BORROWER.    IF  SUCH  CIRCUMSTANCES SHOULD  OCCUR  THEN  INDEMNITOR  SHALL  ADDITIONALLY BE  DIRECTLY  AND  PRIMARILYLIABLE,  ON  A  JOINT  AND SEVERAL BASIS, FOR THE ENTIRE   INDEBTEDNESS EVIDENCED BY THE NOTE AND FOR ALL OF    BORROWER'S OBLIGATIONS  UNDER  THE  LOAN  DOCUMENTS  AND  SUCH INDEBTEDNESS  AND  OBLIGATIONS  SHALL  BE  INCLUDED WITHIN THE TERM "<u>COSTS</u>" HEREUNDER.**

The Guaranty also contains the following provision:

**1. INDEMNITY AND GUARANTY. INDEMNITOR HEREBY ASSUMES LIABILITY FOR, HEREBY GUARANTEES PAYMENT TO LENDER OF, HEREBY AND AGAINST, AND HEREBY INDEMNIFIES LENDER FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES), CAUSES OF ACTION, SUITS, CLAIMS, DEMANDS AND JUDGMENTS OF ANY NATURE OR DESCRIPTION WHATSOEVER (COLLECTIVELY, "COSTS") WHICH MAY AT ANY TIME BE IMPOSED UPON, INCURRED BY OR AWARDED AGAINST LENDER AS A RESULT OF:**

**\*\*\***

**(e) RENTS, ISSUES, PROFITS AND REVENUES OF ALL OR ANY PORTION OF THE PROPERTY WHICH ARE NOT EITHER APPLIED TO THE ORDINARY AND NECESSARY EXPENSES OF OWNING AND OPERATING THE PROPERTY OR PAID TO LENDER BUT ONLY TO THE EXTENT SUCH RENTS, ISSUES, PROFITS AND REVENUES ARE RECEIVED OR APPLICABLE TO A PERIOD AFTER EITHER AN "EVENT OF DEFAULT" (AS DEFINED IN <u>SECTION 2.1</u> OF THE MORTGAGE) OR NOTICE FROM LENDER THAT AN EVENT OR CIRCUMSTANCE HAS OCCURRED WHICH, WITH THE PASSAGE OF TIME OR GIVING OF FURTHER NOTICE OR BOTH, WOULD CONSTITUTE SUCH AN EVENT OF DEFAULT.**

Except for the foregoing provisions, the Loan documents do not set forth any further definition of the word "transfer." The Plaintiffs' expert CPA, Jeffrey Johnston, defined the word "transfer" to mean a disposal of or parting with interest in property."

The Plaintiffs' corporate representative, William Clarkson, noted that the Loan documents have no specific definition of "ordinary and necessary expenses." Clarkson testified that there is room for a borrower and a lender to disagree on the definition of "ordinary and necessary expenses." Clarkson interpreted the phrase to

include "property-level expenses" such as "[u]tilities, electricity, janitorial, landscaping, repairs and maintenance, real estate taxes, insurance."

The Defendants' expert CPA, Donald Wright, testified that legal fees are deductible as "ordinary and necessary expenses" of operating the business under generally accepted accounting principles and under §162 of the Internal Revenue Code, even if incurred to keep a business alive temporarily.  Wright testified that paying the legal expenses of SPP member Egizii and the legal fees of the constructive members is an ordinary and necessary expense of operating the business under §18.5 of the Operating Agreement because SPP is a tiered pass through organization where only individuals are taxed for the distributions they receive. CPA Dorinda Fitzgerald testified that the legal fees of $143,464 and $683,194 incurred by SPP in 2013 and 2014 were deductible ordinary and necessary expenses of operating the properties pursuant to §162 of the Internal Revenue Code.  Wright testified it is a common practice for pass through entities to distribute money to their members at the bottom tier, individual level so that individuals can pay their income taxes on their share of the taxable income reported by the LLC.  Fitzgerald testified that most pass through entities which report taxable income make distributions to cover their members' income tax liability because without those distributions, members would have to pay taxes on their own.

The Plaintiffs' expert witness, Johnston, also testified it is a common practice for LLCs to make distributions to their members for their share of the pass through income tax liability, though he added it is not common for insolvent companies to do so. Johnston opined that these expenditures were not ordinary and necessary expenses of owning the property.

(B)

In 2008, the State of Illinois began having difficulty paying its rents. In turn, SPP started having trouble making mortgage payments to the Lender as the commercial real estate market in Springfield deteriorated. SPP fully complied with the payment terms until October 11, 2012, when SPP failed to make the regularly scheduled Loan payment on the A Note and the B Note. SPP did not make any mortgage payments after the October 2012 payment. The Borrower did later make certain payments to the Plaintiffs that were not contemplated by either of the Notes.

Under the Loan Documents, it is an Event of Default if "any sum payable under this Note is not paid on or before the date of such payment is due." The Plaintiffs notified the Borrower of its defaults by letters dated December 6, 2012, December 31, 2012, and March 28, 2013.

At the time, Torchlight Loan Services, LLC was the special loan servicer on behalf of the Plaintiffs. A special servicer is in charge of dealing with defaulted or distressed loans. William Clarkson, Torchlight's corporate representative, testified

that although foreclosure is one option, a special servicer is always looking for something that provides a better recovery.

The Plaintiffs' March 28, 2013 Demand Letter to SPP and Egizii notified them that Plaintiffs were electing to accelerate the Loan's maturity date, demanding payment in full and invoking the default rate of interest.  In the Letter, the Plaintiffs stated they were entitled to all of the Egizii Portfolio's income and that the rents and cash collateral from the Properties could not be used to pay SPP's attorney's fees arising out of the default.  They demanded that all rents and cash collateral be delivered to the Plaintiffs.  Clarkson testified that SPP would be entitled to retain some rents so that SPP could pay for ongoing repair and maintenance expenses of the Properties.

By the end of 2012, the Borrower was insolvent.  SPP was no longer making its mortgage payments, but was still collecting rents, profits and revenues from the other tenants.  SPP's sole source of income was rents and profits from the Properties described in the mortgages.  Therefore, SPP had to report income to the IRS in 2013.  SPP, a pass through tax entity, sent distributions totaling $416,255.48 to the Constructive Members to cover tax liabilities arising out of SPP's 2013 income.

SPP also made estimated tax distributions to the Constructive Members in May 2014 ($196,915.92) and September 2014 ($95,619.24) based on anticipated income for SPP in tax year 2014.   The Borrower did not report income to the IRS

for tax year 2014.  The Constructive Members owed no taxes in connection with their interest in SPP for tax year 2014.  The Constructive Members are not actual members of SPP.  Its actual members are all entities.

William Clarkson reviewed the Plaintiffs' Complaint and testified that he believed the 2014 tax distributions to Constructive Members violated the Loan documents because the Borrower was insolvent at the time.

(C)

SPP set up a client trust account at Scott & Scott, P.C. ("Scott") on July 26, 2013, pursuant to a written trust agreement maintained in accordance with the provisions of Rule 1.15(f) of the Illinois Rules of Professional Conduct.

In July 2013, EEI paid a $20,000 retainer to Perkins Coie LLP ("Perkins") to represent Egizii.  In September 2013, the Borrower paid retainers to Londrigan, Potter & Randle P.C. ("Londrigan") of $20,000, Scott of $30,000 and Sgro, Hanrahan, Durr & Rabin, LLP ("Sgro") of $10,000.

Between June 20, 2013 and November 5, 2014, the Borrower made 16 transfers totaling $2,004,358 from its checking accounts to a trust account with Scott.  Between July 17, 2013 and December 23, 2014, SPP made 15 transfers totaling $1,147,000 from its checking accounts to be held in an IOLTA trust account, in accordance with Rule 1.15(f), in SPP's name with Londrigan.

SPP created the Scott and Londrigan trust accounts at the suggestion of Lawrence Selevan of Chesterfield Faring, Ltd, who was retained by SPP in May 2013 to help work out a deal with the Lender to resolve the default.  Attorneys R. Stephen Scott and James R. Potter testified that the purpose of placing the rents into the trust accounts was so that the money could be immediately available to transmit to the Lender if a settlement was reached.  SPP disclosed the existence of the trust accounts to Plaintiffs' counsel on October 16, 2013.  SPP exercised dominion and control over the contents of the Londrigan and Scott trust accounts and listed them as assets on its financial records and tax returns.  SPP could access these funds at any time by making a phone call or email to Attorneys Scott or Potter.  The trust accounts were functionally no different than if SPP held the funds in a bank account in its own name.  Neither Attorney Potter, as trustee for the Londrigan trust account, nor Attorney Scott, as custodian for the Scott trust account, made any disbursements from those trust accounts without the approval of Robert W. Egizii acting on behalf of SPP.

William Clarkson testified that SPP's formation of attorney trust accounts was the only action it took in 2013 which he believed violated the Loan documents. Clarkson testified he thought the creation of the attorney trust fund accounts violated the Loan documents because he did not believe the Lender had access to those funds. He was unfamiliar with the operation of attorney escrow accounts.

The Plaintiffs demanded a $250,000 payment from the trust funds to demonstrate the Borrower's good faith in entering into settlement discussions. That payment was delivered on September 24, 2014. Over the course of the next month, SPP paid a total of $625,000 to Plaintiffs from the Scott trust account.

Also on September 24, 2014, SPP caused $550,000 in retainers to be paid to four law firms: Scott ($150,000), Londrigan ($150,000), Sgro ($150,000) and Perkins ($100,000) from the Scott and Londrigan trust accounts. The Law Firms had retainer and special retainer accounts for legal fees and costs that were separate from the Scott and Londrigan trust accounts.

On September 30, 2014, SPP made a $15,000 advance payment to its accounting firm, Pehlman and Dold ("Pehlman") from the trust accounts. SPP claims it received reasonably equivalent value for the $15,000 payment.

(D)

Before filing the two cases in federal court which were eventually consolidated, the Plaintiffs on November 26, 2014 filed suit to foreclose and appoint a receiver in the Circuit Court of Sangamon County, Case Number 2014-CH-456. On December 19, 2014, the state court granted the Plaintiffs' motion to appoint a receiver for the Egizii Portfolio, while permitting the parties to negotiate certain language. On December 23, 2014, the state court entered an Order Appointing Receiver.

In the state court Foreclosure Case, the Plaintiffs originally sought a deficiency judgment in addition to an *in rem* judgment against SPP.  On August 27, 2015, the Plaintiffs filed an amended complaint in the Foreclosure Case seeking only an *in rem* judgment against SPP to permit the federal action to proceed in the face of the Defendants' objections that Plaintiffs were seeking the same relief in two separate courts.

On June 13, 2017, a Judgment *in rem* Foreclosure and Sale was entered in the state foreclosure action.  A Judgment in the Foreclosure Case was entered on April 27, 2018, wherein the court held that the amount due on the Notes was the sum of (i) on the A Loan, $31,902,226.45, plus $6,420.54 per day in interest after December 11, 2016; (ii) on the B loan, $2,587,785.73, plus $673.28 per day in interest after December 11, 2016; (iii) attorneys' fees and costs; and (iv) any advances permitted by the Plaintiffs under the Loan Documents after December 11, 2016.

On April 17, 2018, an order was entered approving reports of sale of the foreclosed Property resulting in a credit totaling $9,400,000 for any amounts due and owing on the claims at issue in this lawsuit.

In the days and weeks before the receiver was appointed, several transactions took place.  On November 12, 2014, an internal Perkins email noted the possibility of the appointment of a receiver and advised that any unallocated retainer funds be

applied "as soon as possible."  On November 26, 2014, the Borrower issued a check to EPM for $11,808.33.  Between December 4 and December 24, 2014, SPP issued seven checks to EEI (through divisions Egizii Electric and BRH) totaling $11,979.30.  On December 16, 2014, the Borrower delivered $100,000 to Londrigan to hold in trust.  On December 19, 2014, Londrigan deposited a $150,000 retainer check that SPP had written to Londrigan on September 24, 2014.  On December 23, 2014, the Borrower delivered $150,000 to Londrigan to hold in trust.

Following a 2016 dispute, Pehlman terminated its relationship with Egizii and his various entities, including non-Defendants.  At the time, Egizii and his entities owed Pehlman $21,114.14.  SPP owed Pehlman nothing.  In February 2017, Egizii and those entities worked out a settlement with Pehlman for $15,000.  Despite owing nothing to Pehlman, SPP funded the settlement--$3,617.50 using the remaining balance of SPP's advance payment and $11,382.50 using a check from the Londrigan retainer account that held SPP's $20,000 retainer from September 2013.

At the time of the trial, a balance of approximately $39,000 remained in the Londrigan trust account and about $6,000 remained in the Scott trust account.

At trial, the disbursements from the Scott trust account challenged by the Plaintiffs as not being ordinary and necessary expenses were the expenditures for legal fees and tax distributions to the Members and Constructive Members.  SPP

authorized Attorney Scott to make a number of distributions.  SPP authorized Attorney Scott to make disbursements from the Scott trust in the amount of $100,000 for operating expenses, $708,000 in total tax distributions to the Members, a $625,000 payment to the Lender on September 14, 2014, and $515,000 attorneys' fees up through November 29, 2018.  Of the $515,000 attorneys' fees amount, $320,000 was delivered to the Scott retainer account and $190,000 was delivered to Perkins' special retainer account.

On February 28, May 30 and September 10, 2014, SPP authorized distributions from the Scott Trust Account to Robert W. Egizii, Michael Egizii, Thomas Egizii, Rodney Egizii, Jodi Baptist, John Pruitt and Clyde Beimfohr based on their percentage of ownership of SPP or of SPP's pass through entity members, in order to pay income taxes on income earned by SPP in 2013.  Before receiving the distributions, each distributee executed a refunding bond in which they agreed, as a condition of receiving the distributions, to reimburse SPP and Egizii for the amount of the distribution they received if the Lender recovered that amount from SPP and guarantor because the distributions were not deemed to be an ordinary and necessary expense of owning the properties.  If the Lender obtained a Judgment against SPP, the Lender could collect the amount of the distributions by means of a citation to discover assets against SPP.

(E)

On September 25, 2014, Londrigan opened a special retainer account with the $150,000 disbursed from the Londrigan trust account at Egizii's direction. The trust accounting shows a total of $148,955 spent for legal fees beginning in January 2015 and continuing through August 16, 2017, and then another $86,000 disbursed between April 17, 2018 and November 26, 2018. At the time of trial, the balance in the Londrigan special retainer was $1,500.

On September 23, 2014, at the direction of Egizii, Attorney Scott deposited $150,000 disbursed from the Scott trust account into a security retainer IOLTA trust account at the Scott law firm.

On October 8, 2014, Attorney Greg Sgro deposited the Advance Payment Retainer of $150,000 received from SPP into an IOLTA trust account. The trust accounting shows a total of $95,050.36 spent for legal fees and costs between September 19, 2013 and continuing through June 12, 2017. On November 30, 2017, Attorney Sgro deposited an advance payment retained from the Londrigan trust account at Egizii's direction. The trust accounting for the special retainer account shows a total of $164,949 spent on legal fees between November 2, 2017 and June 19, 2019.

On July 13, 2013, Perkins entered into a security retainer agreement with Egizii with a payment of $20,000. On September 26, 2014, Perkins entered into an

advanced special retainer account with SPP with the $100,000 dispersed from the Londrigan trust account at Egizii's direction.

(F)

SPP directed the Londrigan Trust Account to distribute a total of $196,245 for repairs and maintenance to the properties including $71,245 for HVAC work to E.L. Pruitt & Co., $100,000 for repairs due to flooding at the Bucari Building and $25,000 to CWLP for utility bills, and further directed the Londrigan firm to pay SPP another $29,176.50 for other operating expenses of SPP. SPP also directed the Scott Trust Account to distribute $100,000 for repairs and maintenance for the work of E.L. Pruitt & Co. for replacement of cooling equipment at the Ridgely Building.

 SPP did not have the prior written consent of the Lender for the deliveries into the Trust accounts, or the distributions, retainers and payments paid from those Trust Accounts.

In addition to the $625,000 in accumulated rents delivered to the Plaintiffs on September 24, 2014, SPP in October 2014 sent to Plaintiffs a check for $130,000 which it had received as an insurance distribution. In January 2015, SPP gave to the court-appointed receiver $80,000 from the balance of its checking accounts. On February 14, 2019 Attorney Greg Sgro, on behalf of SPP, sent to the Plaintiffs a belated rent check in the amount of $17,162.89 received from the State of Illinois.

(G)

In March 2013, Egizii asked Attorneys Greg Sgro, James R. Potter and Steve Scott to provide legal advice to SPP regarding a notice of default SPP had received from the lender.  Attorney Potter was to be SPP's negotiator; Attorney Sgro was engaged because of his expertise in real estate transactions, and Attorney Scott for his expertise in bankruptcy matters.  No written attorney fee agreements were entered into at that time.

In June 2013, Egizii asked Attorney Potter to find an attorney from a national law firm as additional counsel.  Larry Selevan, the financial settlement advisor or workout specialist, had recommended taking such action because the Plaintiffs were represented by a large national law firm.  SPP retained Attorney David Neff from Perkins.

In September and October 2014, SPP and Egizii entered into written attorneys' fees agreements with the Londrigan, Sgro, Perkins and Scott law firms because SPP had been sent a draft foreclosure complaint and it appeared litigation was likely.

In the written attorney agreement with Londrigan, Egizii retained Londrigan on behalf of SPP, himself, the constructive members, EEI and EPM.  A $150,000 advance payment retainer was specified to become the property of Londrigan.

In a written attorney agreement dated October 7, 2014 with Sgro, SPP per Egizii retained Sgro to represent SPP in a dispute with its lender.  An advance payment security retainer of $150,000 was specified to become the property of the Sgro firm, but any balance not used for legal fees was to be refunded to SPP.

On September 23, 2014, SPP per Egizii entered into a written advance payment retainer agreement with Perkins in connection with its dispute with the lender.  An advance payment retainer fee of $100,000 was agreed to and specified to be the property of Perkins.

On September 23, 2014, SPP per Egizii entered into a written retainer agreement with the Scott firm in connection with its dispute with the lender.  A security retainer fee of $150,000 was agreed to with the amount specified to remain the property of SPP until utilized for legal services in connection with SPP's dispute with the lender.

On August 6, 2015, all of the attorneys and parties entered into a "Joint Defense and Common Interest Agreement."   The Parties agreed that joint investigations, sharing of discovery and research could be undertaken to benefit the parties to the agreement.

On September 2, 2015, Londrigan entered into a new joint representation and waiver of conflicts agreement with Robert Egizii and all of the individual

constructive members of SPP in connection with the defense of this lawsuit. Londrigan agreed to continue to represent Egizii and his various business pursuits. The letter stated that the representation was joint, that Londrigan would represent Egizii and all other constructive members simultaneously and that if any conflict appeared, Londrigan would withdraw its representation of the constructive members so that it could continue representing Egizii.  The letter specified SPP would be responsible for the legal fees.

Robert W. Egizii testified he and a bookkeeper reviewed every legal bill that came from the attorneys to ensure that the items listed pertained only to the dispute between SPP and the lender, and would call the attorney if there was uncertainty. Attorneys Scott and Sgro testified they itemized every bill so that it would include only services rendered for SPP.

(H)

All of the legal fees incurred from March 2013 through August 25, 2015 were incurred for the direct representation of SPP arising out of its default on the Loans because each of the four law firms represented SPP during that period.  In a previous Opinion on the Parties' motions to dismiss, the Court found that SPP appeared to have received reasonably equivalent value for the services provided by the attorneys. SPP had a legal obligation to provide a defense to Egizii as a direct member of SPP

under the indemnity provisions of ¶18.5 of the Operating Agreement.  The tax obligations of a pass through entity arise at the individual level.  Paragraph 18.7 of the Operating Agreement provides that the constructive members are assigns of the direct members of SPP.  Plaintiffs' expert Johnston testified that the constructive members "are not [Borrower's] members" and the clause in the Operating Agreement only applies to an actual member being sued by "by reason of it being or having been made such Member."

Londrigan represented Egizii and the constructive members jointly and simultaneously from August 25, 2015.  SPP owed a legal obligation to defend EPM from any claims arising out of its property management services to SPP under ¶6(d) of the Property Management Agreement.  Sgro represented EPM and EEI jointly and simultaneously after August 25, 2015 at the direction of SPP.

(I)

EEI's shareholders include Egizii (92.43%) and his children: Michael (0.45%), Rodney (6.6%) and Jodi Baptist (0.45%).  No stock certificates exist.  EEI has Bylaws but does not hold annual shareholder meetings, nor does it hold regular officer and director meetings, though all are required by the Bylaws.  There are no minutes of meetings.  EEI's only resolution since 2007 was executed in 2010, electing officers and directors for two of its divisions, many of whom are no longer

with EEI.  While new persons fill some of those roles, no new resolutions have been signed.

EEI's employees between 2012 and 2014 included Susan Wesp (CFO), Theresa Pennington, Julie Farrington/Long and Linda Wells.  All were paid by EEI.  All maintained an email domain of "@eeiholding.com" and had email signature blocks indicated they worked for either EEI Holding Corporation or Egizii Electric, Inc.

Despite reporting losses in 2013 and 2014, EEI paid Egizii approximately $395,000 in salary for each of the two years.  Egizii had loaned $800,000 to EEI in 2013.  EEI's executive compensation was not reported on prior years' tax returns and is unknown.

Vince Toolen was an independent contractor for EPM.  He also used an email domain of "@eeiholding.com" and signed documents in various capacities on behalf of EPM and SPP.  Toolen sent letters on SPP letterhead, signing as "Leasing Manager" or "Executive Assistant" of SPP.  EEI, EPM and SPP all designated Toolen as their representative witness at trial.  Toolen's hourly fee was paid by the owner of the property for whom he was working (SPP or other Egizii-owned enterprises).

EPM is a limited liability company whose members are Egizii (85%) and his children, Michael (5%) Rodney (5%) and Jodi (5%).   EPM has Articles of Organization, but lacks a limited liability company (or operating) agreement.   It has no resolutions, never held a meeting of the members and has no minutes of meetings.

The Management Agreement contemplates that EPM will, among other tasks, evict tenants and provide regular financial statements and inspection reports to SPP. EPM did not perform those services.   Toolen calculated EPM's management fee based on the Management Agreement and the Egizii Portfolio's rent roll in 2007. Toolen never looked at the Management Agreement or recalculated accruals after 2007 even after circumstances changed with rents significantly declining and certain tenants not paying timely.

Actual cash payments to EPM were $165,316.62 in 2013 and $141,699.96 in 2014.   This amounted to 6.04% of SPP's gross income in 2013 and 5.28% of Borrower's gross income in 2014, while the Management Agreement allows fees of 3% to 4% of gross income (depending on the building).   In total, the Borrower paid $330,633.24 to EPM between October 11, 2012 and December 2014.

SPP and EPM had no employees.   SPP, EEI and EPM all functioned separately.   The entities had separate bank accounts, separate books, separate stationery and filed separate tax returns.   Susan Wesp testified EEI did not pay

attorney's fees for SPP.  EEI employees would go through the monthly bills for legal fees to make sure that SPP only paid legal bills attributable to SPP.  When EPM and SPP needed administrative support or assistance with finances, Wesp or other EEI employees would assist and did not charge EPM or SPP for their time.  These uncompensated tasks benefitted SPP.  Wesp and Vince Toolen testified SPP treated EEI the same as any other contractor that provided service to it.  William Clarkson testified he was not specifically aware of any instance in which EEI overcharged or didn't provide the repair and maintenance services for which it billed SPP.  Although it owned 700 North MacArthur and did not require a formal lease, SPP occupied part of the space leased by EEI.   EEI and SPP were insolvent in 2013-2014.

Vince Toolen testified SPP gave rent reductions to at least one tenant, McLeod, similar to what it gave EEI in an effort to keep McLeod as a tenant. Moreover, it was in SPP's economic interest to reduce EEI's rent because no other tenants were available at the time.  EEI was paying $7,400 for utilities per month which otherwise would have been SPP's responsibility.

EPM also occupied part of the space at 700 North MacArthur leased by EEI. EPM did not have a lease or sublease for the space nor did its Management Agreement permit it to occupy the premises.  EPM paid no rent to SPP.

EPM made loans to Egizii and the Egizii Family Limited Partnership, which is composed of Egizii and his children and which also owns part of SPP.  No loan documents were signed and no repayment terms were established.

EPM paid $211,546, $314,914 and $277,641 to Robert W. Egizii in 2012, 2013 and 2014, respectively.  All of the payments were characterized as "Contract Labor" expenses on EPM's tax returns.  EPM did not make formal distributions to its members (including Egizii) between 2012 and 2014.

SPP had an Operating Agreement.  It has no resolutions after 2007 and never held any member meetings.  SPP never entered into any resolutions or held any member meetings in connection with the distributions to the Constructive Members in 2014.  SPP had no employees.  When it needed administrative support or assistance with finances, EEI employees would assist and did not charge SPP for their time.

According to the Operating Agreement, SPP's members are 700 North MacArthur, LLC (12.0263%), Egizii Family Limited Partnership (15.1176%), Fifth Street Partnership (16.6967%), Marriot Commerce Building, LLC (27.7759%), Marco Partnership III (4.4615%), Bell Building, LLC (8.1798%), Warehouse Partners, LLC (12.7422%) and Marco (3.0%).  SPP's tax returns are similar, but reflect Robert Egizii individually owning its 12.0263% interest (instead of 700 North

MacArthur, LLC).  The returns also do not reflect Marco owning any part of the Borrower.  Instead, Marriot Commerce Building, LLC owns 30.7759% of SPP, or 3% more than stated in the Operating Agreement.  No assignments exist.

SPP's Operating Agreement did not have any provisions in it exempting its members from the rights and immunities provided by 805 ILCS 180/10-10(a).

Robert Egizii was the primary decisionmaker for EEI, EPM and SPP.

In June 2014, SPP paid $2,600 to Pehlman in partial satisfaction of its invoice dated May 2, 2014.  This invoice was issued to EEI and was for services performed exclusively for EEI.

(J)

In May 2013, the Parties began settlement discussions.  The Defendants utilized the services of Larry Selevan, the financial workout specialist.  Selevan was terminated on November 12, 2013, because he was not able to get the settlement accomplished.  The Defendants also believed that his presence exacerbated instead of facilitated settlement discussions.  Following Selevan's departure, David Neff of the Perkins firm took the lead in conducting settlement negotiations for SPP and Egizii.  Ultimately, the settlement efforts were unsuccessful.

(K)

In Count I, the Plaintiffs assert breach of contract claims seeking Judgment on Note, full recourse, against SPP.  The Plaintiffs also assert SPP, EEI and EPM were alter egos of one another.  The Plaintiffs allege they are entitled to Judgment against Borrower for $31,380,470.40, plus $7,093.82 per diem through the date of judgment, plus interest at the federal judgment rate thereafter.

In Count II, the Plaintiffs assert breach of contract claims seeking Judgment on Note, partial recourse, against SPP.  The Plaintiffs also assert SPP, EEI and EPM were alter egos of one another.  The Plaintiffs allege SPP failed to deliver to Plaintiffs $2,771,917.45 in post-default rental income ($3,379,032.60 delivered to the Law Firms plus the $1,667.81 and $16,217.04 left in the Borrower's accounts minus $625,000 paid to Plaintiffs).  The Plaintiffs also seek entry of judgment against Borrower, EEI and EPM based on alter ego theories of liability.

In Count III, the Plaintiffs allege a breach of contract claim seeking Judgment on Guaranty, partial recourse, against Egizii.

In Count IV, the Plaintiffs allege a breach of contract claim seeking Judgment on Guaranty, full recourse, against Egizii.  As the Court noted, the proceedings are stayed against Egizii pursuant to his bankruptcy filing.

In Count V, the Plaintiffs asserted claims for breach of Illinois Limited Liability Company Act against the Borrower and Members.  In an Order entered on August 15, 2016 [d/e 28], the Court dismissed Count V.

In Count VI, the Plaintiffs assert claims under the Illinois Uniform Fraudulent Transfer Act ("UFTA"), Constructive Fraud, against SPP, Egizii and the Constructive Members.  The Plaintiffs allege SPP committed constructively fraudulent transfers in the amount of $4,748,465.84.  They further contend that the Constructive Members are liable under 740 ILCS 160/9(b)(1) as follows: Thomas Egizii is liable for $59,172.32; Michael Egizii is liable for $18,125.76; Jodi Baptist is liable for $13,797.72; John Pruitt is liable for $45,157.76; and the Estate of Clyde Beimfohr for $123,298.57.

In Count VII, the Plaintiffs assert claims under the UFTA, Actual Fraud, against SPP, Egizii and the Constructive Members.  They allege the Borrower committed actually fraudulent transfers, 740 ILCS 160/5(a)(1), in the amount of $4,748,465.84.

In Count VIII, the Plaintiffs assert civil conspiracy claims against all Defendants.

Count IX was a tortious interference with contractual rights claim asserted against EEI that was dismissed prior to trial pursuant to that Parties' joint motion.

(L)

In an August 15, 2016 Opinion and Order on the Defendants' motion to dismiss, the Court granted the motion to dismiss of the four Law Firm Defendants, concluding that "the Plaintiffs have no right to pre-receivership income to the extent it is sought from the Law Firms," and dismissed all of the claims asserted against the Defendants' Law Firms. [d/e 28 at 45]   The Court also determined that Plaintiffs could not assert any fraudulent transfer claims against the Law Firm Defendants because the Plaintiffs could not establish that a retainer transferred to a law firm lacks reasonably equivalent value or that payment of a retainer to a law firm constituted a fraudulent transfer.   The Court further concluded that, because the Plaintiffs had no right to the pre-receivership income, SPP "could not have intended to defraud the Plaintiffs by transferring property to the Law Firms." *Id*. at 49.

In an August 14, 2018 Opinion and Order denying the Plaintiffs' motion for leave to file a second amended complaint, the Court noted it previously "dismissed the fraudulent transfer claims asserted against the Law Firms on the basis that Plaintiffs 'had no right to the income prior to the appointment of a receiver on December 23, 2014.'"  [d/e 152 at 7].   The Court also determined that, because the Law Firms were paid solely from pre-receivership income, the Plaintiffs' fraudulent transfer claims would be futile.   The Court concluded that Plaintiffs aiding and

abetting and conspiracy claims would also fail "[b]ecause the Plaintiffs have no right to the pre-receivership income as the Court previously held." *Id*. at 9.

In his December 23, 2014 Order appointing Receiver, Sangamon County Circuit Judge John Madonia determined that Plaintiffs were not entitled to pre-receivership rents under Illinois law. The Order defined the receivership property to include only rents generated by the real estate after the appointment of the receiver.

In an Opinion and Order entered on February 28, 2019, this Court granted summary judgment in favor of Plaintiffs and against SPP on Count I and against Egizii on Count IV in the amount of $34,490,012.18. The Court found that the Borrower had transferred property without the Plaintiffs' consent in violation of ¶ 1.5(Y) and full recourse liability was triggered.

## II. DISCUSSION

Legal standards

In order to establish a breach of contract as alleged in Counts I, II, III and IV, the Plaintiffs must prove their allegations by a preponderance of the evidence.

As for Count VI, the Plaintiffs must prove constructive fraud by a preponderance of the evidence. *See Wachovia Securities v. Newhauser*, 528 F. Supp.2d 834, 859 (N.D. Ill. 2007).

Regarding Count VII, the Plaintiffs' actual fraud claims under 740 ILCS 160/5(a)(1) must be proven by clear and convincing evidence. *See Ray v. Winter*, 67 Ill.2d 296, 304 (1977).

As for Count VIII, civil conspiracy is almost always established by circumstantial evidence and not direct evidence, though the circumstantial evidence must be clear and convincing. *See McClure v. Owens Corning Fiberglass Corp.*, 188 Ill.2d 102, 134 (1999). "Clear and convincing evidence" has often been defined as "the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question." *See Bazydlo v. Volant*, 164 Ill.2d 207, 213 (1995).

### Breach of contract claims against SPP- Count I

Under Count I, based on the Court's prior Opinion [d/e 173] and the affidavits of Plaintiffs and its counsel, the Plaintiffs allege they are entitled to judgment against the SPP for $31,380,470.40, plus $7,093.82 per diem through the date of judgment, plus interest at the federal judgment rate thereafter.[2]

The Defendants contend that SPP's creation of the Londrigan and Scott trust accounts and deposit of funds therein are not prohibited "transfers" under ¶1.5(Y) of

---

[2] The Plaintiffs make the same arguments as to Robert Egizii and allege those parties are jointly and severally liable. However, the proceedings are stayed as to Egizii due to his bankruptcy filing.

the Loan Documents under whatever definition of "transfer" is used—whether a dictionary definition or the IUFTA definition, which defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing with or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." *See* 740 ILCS 160/2(l).  Because SPP did not relinquish control of the pre-receivership rents, the Defendants claim there was no transfer and they are entitled to reconsideration on Count I.

The Plaintiffs' predecessor Lender was the drafter of the documents. Therefore, any ambiguity in the Loan documents must be construed against the Lender.  *See Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 311 (7th Cir. 1992); *Nicor v. Associated Elec. Gas*. 223 Ill.2d 407, 417 (2006).

Because the record establishes that the Scott and Londrigan trust accounts were subject to garnishment, remained the property of SPP and were listed as assets on SPP's balance sheets, the Defendants allege the Court should reconsider its prior ruling that it would be more difficult to collect from the Law Firms than from a borrower's account.  *See* d/e 173, at 31.  The Plaintiffs were advised of the trust accounts in October 2013, a few months after they were created.  If the Lender had chosen to proceed to judgment against SPP, SPP's bank accounts and the attorney trust funds would have been subject to garnishment.

While the Borrower's initial deposits into the attorney trust accounts might not constitute prohibited transfers under ¶1.5(Y) given that the deposits were not a parting of interest and SPP maintained control over the funds, there eventually were prohibited transfers under the provisions when the funds were disbursed for attorney's fees and tax distributions without SPP's first obtaining the Lender's prior written consent.  The funds were typically distributed at Egizii's direction.  Because SPP did not first obtain the Lender's consent before making the distributions, "all such indebtedness evidenced by the Note and all the other obligations of Borrower under the Loan Documents [were] fully recourse to Borrower" under ¶1.5(Y).

The Plaintiffs have proven by a preponderance of the evidence that the loans are fully recourse based on SPP's prohibited transfers.  Based on the foregoing, the Court finds that it has no basis to reconsider its earlier ruling wherein it granted summary judgment in favor of Plaintiffs and against SPP as to Count I.  The Court hereby modifies the previously ordered amount of $34,490,012.18, plus interest and attorney's fees, to $31,380,470.40.

<u>Breach of contract claims against SPP- Count II</u>

In Count II, the Plaintiffs seek Judgment on Note, partial recourse, against SPP, in the amount of $2,771,917.45, in post-default rental income, based on SPP's failure to make payments required under the Note beginning with the payment due

on October 11, 2012.   Under Section 2.1 of the Note, the failure to make loan payments as required constitutes an Event of Default.  Following the defaults, the Lender accelerated the maturity of the Loan and declared the entire Loan balance due and payable.

Under ¶1.5(e), the Borrower agreed to be personally liable for certain losses, including any post-default rent not paid to the Lender and "not applied to the ordinary and necessary expenses of owning and operating the Property."   The Plaintiffs claim SPP is liable for $2,771,917.45 in post-default rental income for the amount it failed to deliver in post-default rents, less a credit for any money used to pay "ordinary and necessary expenses of owning and operating the Property."

The Loan documents have no specific definition of "ordinary and necessary expenses."  The terms of an agreement should generally be enforced as they appear. *See Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 479 (1998).  As the drafter of the documents, any ambiguity must be construed against the Lender. *See id*.   A number of witnesses testified as to how the phrase might be interpreted.  While Plaintiffs' representative Clarkson identified "property-level expenses" such as "[u]tilities, electricity, janitorial, landscaping, repairs and maintenance, real estate taxes, [and] insurance," he acknowledged there is room for a borrower and a lender to disagree on the definition of "ordinary and necessary expenses."

Defendants' expert Wright testified that legal fees are deductible as "ordinary and necessary expenses" of operating the business under generally accepted accounting principles, even if incurred to keep a business alive on a temporary basis. CPA Dorinda Fitzgerald testified the post-default legal fees incurred by SPP in 2013 and 2014 were deductible ordinary and necessary expenses of operating the properties under § 162 of the Internal Revenue Code.  SPP's workout consultant, Lawrence Selevan, stated that as a financial adviser, he did not believe that legal fees arising out of Borrower's default should be paid using the Property's income.  Only legal fees that directly relate to the economic operation of the property could be paid using rental income.

SPP also used $283,896.70 of its rental income to pay EPM's legal fees. SPP's rental income was also used to fund EEI's defense.  The Defendants presented testimony this was done because of the existence of claims asserting that SPP, EPM and EEI were alter egos of one another, and SPP thus was acting to protect itself.

The Borrower also used rental income to pay the legal fees of the Constructive Members on the basis that Paragraph 18.5 of the Operating Agreement expressly indemnifies the Borrower's "members."  However, Paragraph 18.7 provides that the constructive members are assigns of the direct members of SPP.

SPP transferred approximately $700,000 to Robert Egizii, Jodi Baptist, Michael Egizii, Thomas Egizii, Rodney Egizii, Clyde Beimfohr and John Pruitt so they could pay their personal income taxes. Dorinda Fitzgerald testified that pass through entities which report taxable income make distributions to cover their members' income tax liability because without such distributions, the members would have to pay taxes on their own. Plaintiffs' expert Johnston stated it was not common for insolvent companies to do that. As previously stated, SPP's actual members were entities and not those individuals. Accordingly, it is difficult to see how those payments could constitute an ordinary expense for SPP.

The Plaintiffs further note that under the Operating Agreement, the 2014 distributions would not have been permitted because SPP by then was insolvent and the Illinois Limited Liability Company Act bars companies from distributing money while insolvent. Moreover, the Borrower did not report any income on its tax returns in 2014 to pass through to its members.

Additionally, SPP acknowledged the fact that it had income in 2013 was primarily because it had stopped making mortgage payments. It seems unlikely that expenses arising out of such an act would be ordinary and necessary.

In Count II, the Plaintiffs seek $2,771,917.45 in SPP's post-default rental income, consisting of $3,379,032.60 delivered to the Law Firms plus $1,667.81 and

$16,217.04 left in SPP's accounts minus $625,000 paid to the Plaintiffs.   The Borrower is personally liable under ¶1.5(e) if this post-default rent was "not applied to the ordinary and necessary expenses of owning and operating the property."

The Court is unable to conclude that any of those funds were used for ordinary and necessary expenses under ¶1.5(e).   While the phrase is not defined, the Court finds no ambiguity under the circumstances of this case.   Legal fees which related to the operation of the property might qualify as "ordinary and necessary expenses." Johnston testified that SPP's legal expenses in 2011 were about $5,000 and were also a very low number in 2012.   Those fees would likely qualify as "ordinary and necessary expenses of owning and operating the property."   Here, the Law Firms held the money in trust and the funds were then sent to the firms for legal expenses or to other Defendants or third parties.

Because it does not appear that any of the legal fees related to the ownership and operation of the property, the Court concludes that SPP breached the contract as alleged in Count II.   Moreover, SPP's transfer of funds while insolvent to the constructive members—who were not actual members--so that they could pay legal fees or income taxes also would not constitute "ordinary and necessary expenses of owning and operating the property."

Based on the foregoing, the Court concludes that Plaintiffs are entitled to judgment on Count II against SPP in the amount of $2,771,917.45 in post-default rental income.

Counts III, IV, V and IX

Counts III and IV are asserted solely against Robert W. Egizii, and the proceedings as to him are stayed due to his bankruptcy filing.

The Court previously dismissed the Illinois Limited Liability Act claims asserted in Count V.

The tortious interference with contractual rights claims asserted in Count IX were also dismissed prior to trial.

Constructive Fraud claims--Count VI

(1)

Count VI includes constructive fraud claims under UFTA against SPP and the Constructive Members.[3]   The Plaintiffs allege SPP committed constructively fraudulent transfers in the amount of $4,748,465.84.  This includes $2,004,358 to Scott to hold in trust and $1,147,000 to Londrigan to hold in trust, along with $819,841.28 paid to Scott and $577,933.32 it paid to law firms that represent other

---

[3] Count VI is also asserted against Robert W. Egizii, but those proceedings are stayed.

persons or entities.   They also assert the constructive members committed constructive fraud in various amounts.

Constructive fraud occurs when a transfer is made "without receiving a reasonably equivalent value in exchange for the transfer or obligation," and either the debtor "was engaged in or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business transaction" or the debtor "intended to incur, or believed or reasonably should have believed he would incur, debts beyond his ability to pay as they became due."   740 ILCS 160/5(a).   The value of a reasonably equivalent transfer is determined at the time the transfer was made.  *See In re McCook Metals, L.L.C.*, 319 B.R. 570, 579 (Bankr. N.D. Ill. 2005).   The plaintiff must prove that the debtor received less than reasonably equivalent value.  *See Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997).

The Plaintiffs cite the testimony of Vince Toolen, the Borrower's designated corporate witness, who stated that "Mr. Egizii transferred over $3.5 million to four different law firms because he was worried about the lender seizing the account[.]" The Plaintiffs contend the Act exists to prevent transfers such as this.

All of the transfers occurred when the Borrower was insolvent.  The Plaintiffs note there is no rational purpose for SPP to have paid $3.2 million to the Law Firms

in 2013 and 2014, when SPP incurred legal fees of $5,577.60 in 2012.  When the Plaintiffs in December 2014 requested that the Law Firms turn over the trust funds, the Scott and Londrigan firms claimed that the money was paid to them and protected as advance payment retainers.  In April 2015, the Plaintiffs sent another letter demanding turnover of the trust funds only.  Scott and Londrigan responded that the funds were protected as advance payment retainers.  The attorneys testified at trial that they held security retainers, not advance payment retainers.

In *Dowling v. Chicago Options Associates, Inc.*, 226 Ill.2d 277 (2007), the Illinois Supreme Court warned that advance payment retainers could be abused in cases where the debtor is resisting a creditor's efforts to collect on a judgment: "We are aware of the potential for abuse of advance payment retainers, particularly in circumstances such as the instant case where a judgment debtor seeks to resist efforts of a judgment creditor to collect on a judgment.  No argument has been raised in this case that the retainers paid to Piper were excessive in light of the services that the parties anticipated Piper would render to Davis and Seibel."  *Id*. at 295.

At the time the $450,000 in advance payment retainers were paid in September 2014, the Parties were discussing a potential settlement.  The Law Firms had been paid for all legal invoices to that point and had received $80,000 in retainers.  The Illinois State Court Foreclosure Case was filed in November 2014.

41

This case was not filed until June 2015.  The Plaintiffs contend the Borrower thus did not receive reasonably equivalent value at the time of the transfer.

The Defendants claim that the issue of whether attorney's fees constituted fraudulent transfers was decided in an August 16, 2016 Opinion and Order [d/e 48] allowing the motion to dismiss of the Law Firm Defendants, when the Court held that Plaintiffs have no right under Illinois law to Trust Funds and Retainer Funds paid to the Law Firms before December 23, 2014, the date on which a receiver was appointed.  The Court stated, "Because the Plaintiffs had no right to the income prior to the appointment of a receiver on December 23, 2014, the Borrower could not have intended to defraud the Plaintiffs by transferring property to the Law Firms."  [d/e 28, at 49].

Two years later, in denying the Plaintiffs' motion for leave to file a second amended complaint, the Court reiterated that Plaintiffs could not assert constructive fraudulent claims against the Law Firms: "The Court finds that the Plaintiffs have alleged no new evidence showing a lack of reasonably equivalent value regarding payments made.  Accordingly, the fraudulent transfers claims fail for the same reason."

The Defendants further allege that because the Court has already determined there was both reasonably equivalent value and no intent to defraud creditors, it

follows that the Constructive Members can have no liability for fraudulent transfers related to those transfers. This is true even though the motion to dismiss the fraudulent transfer claims as to SPP and the constructive members was denied in the August 16, 2016 Order.

The Defendants note that, at the time the complaint was filed, the attorney's fees were only $149,000, while the advance payment retainers amounted to $500,000. Since then, the circumstances have changed and attorney's fees have been incurred. The Defendants contend, therefore, that what might have seemed a plausible fraud claim in 2016 is no longer viable.

At trial, Robert W. Egizii testified that SPP hired four law firms because the law firm representing the Plaintiffs, Miller Canfield, had approximately 275 lawyers and could overwhelm any single Springfield firm. Although only two lawyers from Miller Canfield worked on the instant case, the Defendants note that ten attorneys worked on the State Court Foreclosure Case for the Plaintiffs. Egizii testified the Londrigan firm was hired so that Bud Potter could be the negotiator; the Sgro firm was hired because of Greg Sgro's real estate experience; the Scott firm was hired due to Steve Scott's bankruptcy experience; and David Neff of Perkins was hired when Larry Selevan recommended that a national firm be retained. The four firms collaborated and signed a Joint Defense Agreement.

The delivery of funds by what was then an insolvent SPP to Scott and Londrigan to hold in trust certainly looks suspicious under all of the circumstances— when the funds were later used to pay the Law Firms, other entities and the constructive members. This is particularly true when compared with the amounts expended on attorney's fees in previous years. However, the existence of the trust funds was disclosed at the time the Parties were engaged in settlement negotiations. If an agreement was reached, the funds in the trust accounts would have been a major component of the settlement. Each of the Defendants' settlement proposals was rejected by the Plaintiffs. The Plaintiffs contend the Defendants never had any intention of settling, which is why Selevan was terminated when he believed the Parties were on the verge of settlement. It was also during active settlement discussions that retainers were distributed to the Law Firms and funds were distributed to the constructive members.

At the time the trust funds were created, a receiver had not yet been appointed so the Borrower was not precluded from contracting for legal services. When settlement was not reached, the funds were used to pay for the legal fees. The Court has no basis to question that SPP received reasonably equivalent value for the attorney's fees that were paid. There was testimony SPP hired each of the four firms to perform different tasks. The four firms represented SPP from the date of default through August 25, 2015.

(2)

After August 25, 2015, the Londrigan firm represented Robert W. Egizii, a member of SPP, jointly with the constructive members. While the indemnity clause of the SPP Operating Agreement creates a legal obligation for SPP to defend its members such as Egizii, it would not appear to apply to the constructive members, who are assigns of the direct members. Given that the Londrigan firm represented Egizii simultaneously with the constructive members—none of whom were deposed or called at trial and none of whom had a role in SPP's management—any time spent exclusively on the defense of the constructive members would have likely been minimal.

Attorney Greg Sgro represented EPM and EEI jointly and pursuant to Defense Counsel's Joint Defense Agreement. It does not appear that SPP had a duty to defend EPM under ¶6(d) of the Property Management Agreement because the Parties' dispute does not pertain to the management of the property. Attorney Sgro testified it was for the benefit and protection of SPP that EPM and EEI be represented in this case because of the alter ego allegations in the complaint. Because EPM and EEI were alleged to be alter egos of SPP, a default judgment against EPM or EEI would also constitute a default judgment against SPP. SPP thus received a benefit from fees expended on EPM and EEI.

Based on the foregoing, the Court finds that SPP received reasonably equivalent value from Londrigan's and Sgro's representation of the related parties—the constructive members, EEI and EPM.  Because it finds that SPP received reasonably equivalent value for the attorney's fees that were paid, the Court is unable to conclude there was constructive fraud as to the attorney's fees.

(3)

The Plaintiffs allege the Borrower did not receive reasonably equivalent value for the $708,790.64 it distributed to the constructive members in 2014.  Under 805 ILCS 25-30(a), a limited liability company may not distribute money while insolvent.  The Parties dispute whether the refunding bonds signed by the constructive members promising to pay the money back if the expenses were not ordinary and necessary expenses of operating the property constituted reasonably equivalent value.

The Plaintiffs note that nothing in the Borrower's Operating Agreement mandates distributions.  The Operating Agreement incorporates the Illinois Limited Liability Company Act's prohibition on distributions while insolvent.

There is no evidence that the constructive members delivered any tangible assets or provided any services.  The Defendants claim that the refunding bonds signed by Robert Egizii and each constructive member before receiving the tax

distributions provided reasonably equivalent value at the time the transfers were made. Attorneys Scott and Sgro testified that by obtaining a judgment, the Lender could have obtained access to these funds in a citation proceeding.

Plaintiffs' expert Jeffrey Johnston described the refunding bonds as a "contingent asset, and the value of that asset would need to be considered in the context of whether or not it constituted reasonably equivalent value." Johnston testified that while the refunding bond may have some value, it is not "reasonably equivalent value" because of the "uncertainty associated with it."

At the time of the transfers, the value of the refunding bonds was, at best, speculative. Because consideration is valued at the time of the transfer, *see McCook Metals*, 319 B.R. at 579, and there was no judgment against SPP at the time, any consideration that the refunding bonds had was not then in a form available to creditors and does not constitute reasonably equivalent value under the UFTA. Accordingly, the Court concludes that SPP committed fraud in the amount of $708,790.64 by distributing the funds to the constructive members in 2014 when it was insolvent.

To the extent that Plaintiffs allege the constructive members are liable for constructive fraud as transferees under 740 ILCS 160/9(b)(1) for receiving funds from SPP for tax distributions, the Court disagrees. A member generally is not liable

for the debts or obligations of a limited liability company.  *See* 180 ILCS 10/10(a).
A member may be liable if the articles of organization contain a provision
authorizing such liability and the member has consented or agreed to be bound by
the provision.  *See*  180 ILCS 10/10(d).  SPP's Operating Agreement has no
provisions which makes SPP's members or their assigns such as the constructive
members liable for any torts, debts or liabilities of the company.

The Plaintiffs rely on a recent Seventh Circuit case which confirmed that an
individual who is sued because of his individual acts as a participant in a fraudulent
scheme can be held liable, despite the language in the Illinois Limited Liability Act
That court stated:

> Kaufman participated individually in each of the closings as counsel for the
> seller. He also personally directed Traditional Title's employees to conceal
> the fraud from Fifth Third. In these dual roles he participated in the fraud for
> his own personal gain. The judgment against Kaufman was not derived solely
> from Traditional Title's liability, based on his membership in the LLC.
> Section 10-10 does not bar his liability here.

*Fifth Third Mortgage Co. v. Kaufman*, 934 F.3d 585, 589 (7th Cir. 2019).

The Plaintiffs claim the constructive members actively participated in the
conspiracy by signing the refunding bonds, with full knowledge of the Plaintiffs'
claims and the Borrower's efforts to deprive Plaintiffs of their funds.  Vince Toolen
had delivered the Plaintiffs' March 2013 letter to the constructive members which
stated that Plaintiffs claimed a right in the rents.

As noted earlier, the constructive members as members of the members of SPP are at best indirect members.  However, the Court is unable to conclude that the constructive members are at all similar to an attorney who actively participated in and directed concealment of a fraudulent scheme at real estate closings as in *Kaufman*.  While the constructive members benefitted from SPP's fraud, the constructive members did not make the transfer and were passive actors.  There is no evidence they originated the plans to receive the distributions.  Because of their limited participation, the constructive members are not liable in Count VI for fraud.

The constructive members also are not liable for fraud under UFTA for the same reason the Court determined in its August 15, 2016 Order that the Law Firms had no liability for fraud.  The Court noted that the Law Firms had not signed any of the Loan Documents and had received pre-receivership rents.  The constructive members are in precisely the same position.

For the foregoing reasons, the Court concludes that the SPP's constructive members are not liable for constructive or actual fraud under UFTA.

(4)

On the eve of the final day of trial, the Plaintiffs sought to file an amended complaint asserting fraud claims in Counts VI and VII against EPM and EEI based on alter ego theories of liability.  In the final Pretrial Order, the Plaintiffs assert

damages under Counts VI and VII alleging post-default fraudulent transfers to EPM in the amount of $330,633.24.  The Plaintiffs also claim that SPP's failure to collect rent from EEI amounted to a transfer of $1,003,800 for which SPP did not receive reasonably equivalent value.

The Court notes that neither EPM nor EEI is listed as a Defendant in Counts VI and VII of the Plaintiffs' original complaint.  The Plaintiffs' motion for leave to file an amended complaint was denied.  To the extent that Plaintiffs pursue those legal theories against EPM and EEI in their final briefs, the Court declines to find that EPM and/or EEI are liable for fraud under Count VI and VII.

The Plaintiffs also now allege that the Borrower did not receive reasonably equivalent value for the $15,000 advance payment in September 2014 to Pehlman or the $15,000 Pehlman settlement that Borrower fully funded in February 2017. Because these allegations were not included in the complaint, the Court declines to find that the payments to Pehlman constituted fraud under Count VI and Count VII.

<u>Actual fraud claims- Count VII</u>

Count VII includes actual fraud claims.  The Plaintiffs must prove actual fraud under 740 ILCS 160/5(a)(1) by clear and convincing evidence.  *See Ray*, 67 Ill.2d at 304.  A debtor makes a transfer or incurs an obligation that is fraudulent to a creditor when done "with actual intent to hinder, delay, or defraud any creditor of the debtor."

740 ILCS 160/5(a)(1). Illinois recognizes the right of debtors to pay their attorneys advance payment retainers before the debtor files for bankruptcy. *See Dowling v, Chicago Options Assocs., Inc.*, 226 Ill.2d 277, 289-290 (2007). Under such fees arrangements, attorneys are required to promptly refund any unearned fees after the representation concludes. *See id.* at 293.

To assist in determining actual intent, the statute contains a list of eleven non-exhaustive badges of fraud, or factors that may be considered in determining whether a transfer was made with the requisite intent. *See In re Grube*, 462 B.R. 663, 664 (C.D. Ill. 2012). A number of those badges of fraud under 740 ILCS 160/5(a)(1) are present in this case. Some of the transfers were made to insiders—the constructive members, EEI and EPM. Some transfers were concealed and not disclosed. SPP had been threatened with suit and engaged in the transfers while insolvent. Moreover, the transfers occurred soon after the Loan was accelerated.

The Plaintiffs must show it was highly probable that the attorney's fees payments and other transfers were made to defraud the Lender. The Plaintiffs point to testimony that SPP's intent in delivering money to Scott and Londrigan to hold in trust was to affect settlement negotiations with Plaintiffs and/or pay its operating expenses while avoiding paying Plaintiffs and thereby staying in business. Plaintiffs' expert Johnston testified that the only reasonable explanation for SPP's course of dealing around the time the retainers were paid and immediately prior to

the appointment of a receiver is that SPP was attempting to put its funds out of Plaintiffs' reach.

Certainly, there is some evidence of fraudulent intent. However, SPP's multiple settlement offers to Plaintiffs also suggests there was no actual or specific intent to defraud the Lender. While the Court recognizes that Plaintiffs had to investigate SPP's financial position before accepting any settlement and no settlement was reached, the offers tend to negate any actual intent to defraud the Lender. In September 2014, SPP even paid $625,000 as a showing of good faith during negotiations. While the Plaintiffs question SPP's sincerity in pursuing settlement, it was Plaintiffs who rejected the proposals. Although the offers were not acceptable to the Plaintiffs, the Court has no basis to find that they were made in bad faith.

Based on the foregoing, the Court finds that Plaintiffs cannot prove by clear and convincing evidence that SPP's transfers after becoming insolvent were done with intent to defraud the Lender. Accordingly, the Plaintiffs have not proven the Borrower committed actually fraudulent transfers as alleged in Count VII. To the extent that actual fraud is asserted against the constructive members, the Court concludes that Plaintiffs have not established by clear and convincing evidence that constructive members committed actual fraud.

<u>Alter ego claims</u>

In Count I, the Plaintiffs also seek to pierce the corporate veil of SPP on the basis that EEI and EPM function as a mere instrumentality, alter ego and agent of SPP.  The Plaintiffs assert that allowing EEI and EPM to maintain separate corporate identities would result in injustice to Lender because of assets transferred from the Borrower to the Lender.

"Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."  *See Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 205 (1981).  To pierce the corporate veil, Plaintiffs must establish the following elements: (1) there must be such unity of interest and ownership that the separate personalities of the corporations no longer existed; and (2) the adherence to the fiction of separate corporate existences would sanction a fraud.  *See Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985).  "[P]iercing of the corporate veil on an alter ego theory is available only where failing to provide such relief would promote injustice or inequity."  *International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 737 (7th Cir. 2004).

(1)

The Defendants note alter ego liability in breach of contract cases is a very difficult standard to meet, especially when the contracting parties knew of the common ownership at the time of contracting.   The Lender approved the organizational documents for each entity.   EEI was involved in the electrical contracting business; EPM managed real estate for SPP and other properties and SPP owned the real estate at issue.

The Plaintiffs state that because of the potential for abuse, it was very important that the entities maintain arms-length relationships.   Therefore, the Borrower's Agreement and the Mortgage documents contain provisions which include safeguards that must be observed for the Borrower to maintain its separate identity.

There was testimony at trial that the three entities kept separate bank accounts, separate books, separate stationery, filed separate tax returns, they did not commingle funds; SPP and EPM kept their records in separate filing cabinets, EEI kept its records in a separate office, EEI had a separate accounting system, servers and logins.  EEI employees examined the bills for legal fees to ensure that SPP only paid legal bills attributable to SPP.  Vince Toolen, who was the corporate witness

under Federal Rule of Civil Procedure 30(b)(6) for each of the three entities, testified that SPP treated EEI the same as any other contractor that provided services to it.

EEI and SPP were both insolvent after 2012 and there was also testimony that safeguards were not always observed.  SPP and EPM both occupied a portion of the space leased to EEI at 700 North McArthur.  Neither had a sublease or paid rent. The three entities all shared the same administrative staff: Linda Wells, Julie Farrington/Long and Theresa Pennington.  All were employed and paid by EEI but, according to Toolen, performed work for the Borrower "on a daily basis."  They entered SPP's accounting information into the computer.  They directed the Law Firms on how to dispose of funds in SPP's trust accounts.  Toolen testified they helped him locate materials to respond to the Borrower's discovery requests.  The three entities kept their books and records in the same office.

(2)

Vince Toolen testified he worked as an "independent contractor" for EPM, though he did not receive his paycheck from EPM.  EPM had no employees.  Toolen testified that in order to get paid, he would invoice whichever of Egizii's properties he happened to be working for, such as SPP.  He would then give the invoice to one of EEI's administrative employees who would obtain Egizii's approval for payment.

Toolen spent approximately 90% of his time in the same office where the three entities were all located.

At different times, Toolen held himself out as "Borrower's Executive Assistant," when he advocated for a rent reduction on behalf of EEI, and Borrower's "Leasing Manager," when communicating with the Plaintiffs' representatives about the Loan. On one occasion, he directed an EEI employee, Theresa Pennington, to prepare a check to the Plaintiffs from the Borrower's checking account to effect a reduction in EEI's rent, under EPM's signature. Toolen testified he had access to EEI's financials as well as SPP's. He reviewed SPP's accounting information at the end of each month.

Susan Wesp, EEI's CFO from June 2008 to November 2013, testified she was a signatory on EEI's checking account and also an authorized signatory on the Borrower's checking account. Robert W. Egizii testified Wesp was an authorized signatory for SPP because he was often away from the office and it was more convenient. Wesp also helped Toolen respond to the Plaintiffs' inquiries relating to the Egizii portfolio. Wesp testified she also helped out with EPM if needed.

Vince Toolen testified he did not see a conflict with EEI's CFO assisting with SPP and described it as "free help." This was around the time that EEI requested a rent reduction. Egizii testified Wesp also provided information about SPP to Larry

Selevan, SPP's workout representative.   During this period, Egizii and Wesp appeared to be the only officers or directors who played an active role for EEI.

(3)

The record establishes that each of the three entities was undercapitalized. Undercapitalization is an important factor in determining whether the corporate entity should be disregarded.  *See Fentress v. Triple Min., Inc.*, 262 Ill. App.3d 930, 938 (4th Dist. 1994).  Plaintiffs' expert Johnston testified that "[u]ndercapitalization refers to the inability to pay debts as they become due, either presently or in the future . . . due to a lack of capital."   Johnston strongly believed SPP was undercapitalized at least from 2012 on.  The Borrower reported losses on its tax returns in 2012 and 2014 and would have in 2013 if it had paid interest to the Plaintiffs.

Johnston also testified that EEI was undercapitalized.  The evidence showed that EEI requested a number of rent reductions for the space it occupied at 700 North MacArthur and eventually stopped paying rent altogether.   EEI's business was failing due to the poor economy.  It reported losses on its tax returns in 2012, 2013 and 2014.

EPM was also undercapitalized and claimed a loss on its taxes for years 2013 and 2014.

This resulted in the financial interdependence of the entities.  Johnston noted that EEI was financially dependent on SPP because it owed rent to SPP and relied on the Borrower's grant of rent reductions.  EEI owed the Borrower $325,000 in annual rent and paid nothing in 2013 or 2014.  EPM was tasked with enforcing leases under the Management Agreement, though neither SPP nor EPM ever demanded payment from EEI or sought eviction.  EPM was financially dependent on the Borrower.

(4)

The record also shows that none of the entities observed corporate formalities.  When the membership of SPP changed, it was not documented in the Operating Agreement as required.  The Operating Agreement provided that SPP shall hold regular meetings.  Toolen had no knowledge of regular meetings.

Section 8 of the Operating Agreement only permits distributions "[t]o the fullest extent allowed by the Illinois Limited Liability Company Act[.]"  The Borrower did not issue distributions until it was insolvent in 2014.  In 2014, it made distributions to the constructive members, rather than SPP's actual members.

Vince Toolen testified he and EEI employees Linda Wells and Susan Wesp all had access to Borrower's financials.  Section 13(d) of the Operating Agreement states that Borrower shall "hold itself out to creditors and to the public as a legal

entity separate and distinct from any other entity." It was also to "correct any known misunderstandings regarding its separate identity." However each officer, director and employee of EEI, EPM and Borrower—including Egizii, Toolen, Wesp, Wells, Farrington/Long and Pennington, used @eeiholding.com as their email domain, thereby holding themselves out to the public as EEI employees. This confused the Plaintiffs, who addressed two separate letters in February 2013 intended for the Borrower to EEI employees Wesp and Wells.

All three entities used the same accounting firm, Pehlman, and EEI employees communicated with Pehlman regarding all three entities.

In sum, SPP never held itself out to third parties as separate from the other entities. Moreover, the officials who were affiliated with any of the entities also did not treat SPP as separate from EEI and EPM.

EEI's actions also did not reflect any provisions of its by-laws. Neither Toolen nor Wesp recalled any formal meetings.

EPM did not have a formal operating agreement. It held no formal meetings and kept no minutes of meetings.

EPM made no distributions but paid $314,914 and $277,641 in 2013 and 2014 to Egizii, its 85% owner, for "contract labor."

(5)

The record shows that at times, the three entities did not keep each other at arm's length as required under Illinois law and Section 13(g) of the Borrower's Operating Agreement.

When EEI's lease began in 1998, Robert W. Egizii signed individually as Lessor and also signed for Egizii Electric, one of EEI's divisions.  In the amendment in 2002, Egizii signed as CEO of Egizii Electric and individually as Lessor.  In Lease Amendment No. 2 in 2006, Egizii signed as CEO of Egizii Electric and Manager of 700 North MacArthur, LLC.  Lease Amendment No. 3 was signed in 2009 by Egizii as President of Springfield Prairie Properties SPE, Inc., as Manager on behalf of Borrower, and Wesp signed on behalf of EEI.

The leases show that Egizii was in control of both landlord and tenant.  The lease amendments do not recite anything about the landlord changes from Egizii, individually, to 700 North MacArthur, LLC to Borrower.  Toolen testified he was unaware of any assignments of the initial lease.  This suggests that before 2011 SPP, EEI and EPM were not operating at arm's length.

Lease Amendment No. 3 reduced EEI's monthly rent from $27,100 to $22,000 per month for a two-year period, at the end of which rent would return to $27,100 per month.  When the period expired in September 2011, SPP left rent at

$22,000 per month.  Neither the Borrower nor EEI requested an extension of the rent reduction.  This cost SPP more than $60,000 over the year that followed.

Lease amendments required the Plaintiffs' approval after the loan was made. When the Borrower sought approval for Lease Amendment No. 3 in 2009, Toolen signed the letter as SPP's executive assistant, even though he was an independent contractor for EPM.  EPM's Management Agreement did not contemplate EPM representing SPP in dealing with the Plaintiffs.  Toolen spoke for the Borrower in advocating for a rent reduction for EEI.  The Plaintiffs approved Lease Amendment No. 3, not knowing that Toolen was not actually employed or engaged by Borrower.

On October 31, 2012 Toolen, while acting as "Leasing Manager" for SPP, wrote to the Plaintiffs asking to cut EEI's rent in half from $22,000 to $11,000 per month, even though the rent should have returned to $27,100 per month more than one year earlier.  Toolen's letter regarding cutting EEI's rent to $11,000 per month does not include any discussion of whether the property could be re-leased and at what rate.  Susan Wesp, who signed the letter for EEI requesting a rent reduction, was consulted regarding market conditions.  Toolen testified that SPP never hired a broker to market 700 North MacArthur for lease in order to try to find a tenant who might pay a higher rent than EEI.  The Plaintiffs did not approve the amendment request because a further reduction would have worsened the Borrower's precarious financial position.

Even though it was not approved by the Plaintiffs and neither SPP nor EEI signed the lease documents, SPP reduced EEI's rent obligation on SPP's books to $11,000 per month beginning on January 1, 2013.  However, EEI stopped paying rent altogether on January 1, 2013.  Toolen testified that the reason EEI stopped paying rent was to prompt the Plaintiffs to negotiate with SPP about the Loan.  EEI had a contract with SPP and it would not be an appropriate negotiation tool for a third party to default to force settlement discussions.

Following EEI's default, neither the Borrower nor EPM demanded payment from EEI or sought to evict it from 700 North MacArthur.  EEI stayed on site for two years after defaulting until a receiver was appointed without paying any rent to SPP.  This cost the Borrower $650,000.  During the same period, SPP paid EEI more than $350,000 for EEI's services without ever offsetting against rent.  SPP even provided a $55,000 credit against its back due rent.

As with EEI, SPP gave rent reductions to McLeod in an effort to keep them as a tenant.  Thus, some evidence was presented that another entity was treated similarly to EEI.  Toolen testified it was in SPP's economic interest to reduce EEI's rent because other tenants were not available.  The $7,400 per month in utilities paid by EEI would otherwise have been SPP's responsibility.

Toolen testified that other State of Illinois tenants were in default and the Borrower had to treat all tenants the same.  He stated EEI was not evicted for that reason.  However, the State did not fail to pay entirely.  The State was in arrears but paid some of the funds it owed during the two years EEI paid nothing.  As Plaintiffs' expert Johnston testified, moreover, it was a failure of corporate formalities for neither SPP nor EPM to enforce EEI's lease.

There were also loans to Robert Egizii and Egizii Family Limited Partnership (composed of Egizii and his children) which were reflected on EPM's financial statements, including its tax returns for 2012-2014 and its balance sheets.  Loans to Egizii Family Limited Partnership appear on EPM's financial information but no documents were produced and no one could identify the loans or their terms.

The record showed there was commingling of funds among the three entities. Wesp acknowledged it would be commingling if SPP was paying the bills of EEI. SPP was also required under the Operating Agreement to "maintain books and records and bank accounts separate for any other person."  The evidence showed that Borrower paid the expenses of other entities.  SPP paid $350 annually for corporate fees of RWE of Illinois, LLC and RWE of Springfield, Inc.  It paid $650 to Pehlman for an EEI invoice.  It paid EEI's $3,000 portion of a legal invoice issued by Londrigan.  In February 2017, the Borrower paid all of a settlement payment to Pehlman which resolved over $20,000 in obligations owed by non-Borrower entities,

$8,495.20 of which was owed by EEI.  SPP also paid legal fees incurred to defend EEI and EPM.  EEI paid Egizii's initial retainer to the Perkins firm.

(6)

Because of these actions diverting money among the three entities, the Plaintiffs were deprived of significant funds.  Robert W. Egizii personally received $415,037.21 in distributions from the Borrower while it was insolvent.  The constructive members received another $293,753.43.  Egizii received almost $400,000 in annual salary from EEI during the time that EEI paid no rent.  Egizii personally received $211,546, $314,914 and $277,641 from EPM as "Contract Labor" fees in 2012, 2013 and 2014, respectively, which is consistent with EPM's gross receipts of $232,485, $317,957 and $277,776 in the same years.  Egizii and the Egizii Family Limited Partnership owed loans to EPM that were never documented or paid.  These actions contributed to draining SPP of money, while placing significant funds in Egizii's pocket along with those of his family and friends.

Based on the evidence presented at trial, the Court finds, therefore, under Count I that SPP, EEI and EPM are alter egos of one another.  The entities included the same employees, paid by EEI exclusively.  All three entities worked out of the same office, which was leased exclusively to EEI.  EEI's officers and directors acted

for all three entities and all three utilized the same designated corporate witness. None held regular meetings or kept corporate minutes.  SPP did not document transfers of its membership interests from 700 North MacArthur, LLC to Robert Egizii or from Marco Partnership to Marriot Commerce Building, LLC.  Each entity used the same email domain and otherwise held themselves out as one entity.  When the Borrower and EEI became insolvent and were unable to pay their regular obligations—for the Loan and Lease, respectively—as they came due, SPP and EEI commingled funds by paying for one another's obligations, particularly legal expenses.  The Parties failed to maintain arms-length relationships.  SPP and EPM failed to enforce the terms of EEI's lease, EPM did not perform the management services required under its contract with SPP, among other things.

The Court further concludes that respecting the corporate form of SPP, EEI and EPM would work a fundamental injustice.  The breach of corporate formalities and arms-length dealings systematically deprived SPP of funds by overpaying management fees and underpaying rent without enforcing the terms of the lease.  At the same time, SPP engaged in other activities designed to deprive the Plaintiffs of any recovery on their Notes.  In 2013 and 2014, EEI paid a nearly $400,000 per year salary to Egizii; EPM paid $592,555 to Egizii as "Contract Labor" fees, and SPP distributed $415,037.21 to Egizii.  Accordingly, EEI and EPM are jointly and

severally liable as alter egos for the amounts for which the Borrower is liable on Count I.

### Civil conspiracy

(1)

In Count VIII, the Plaintiffs allege civil conspiracy claims as to all Defendants, contending that two or more of the Defendants knowingly conspired in a common scheme or plan to place the assets of Borrower, Egizii or both outside of the reach of creditors such as the Lender—by engaging in collateral transfers and lease transactions.  The Plaintiffs assert the Borrower did this to avoid its obligations to its creditors.  They further contend this was accomplished through unlawful means, including breaching contractual obligations, breaching the Illinois Limited Liability Company Act and engaging in fraudulent transfers.

Illinois law defines civil conspiracy as "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill.2d 302, 317 (2004).  "The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the

intended conspiratorial result." *Lenard v. Argento*, 699 F.2d 874, 882 (7th Cir. 1983).

The Defendants claim that SPP, its members and constructive members, EEI and EPM cannot conspire with each other because a corporation cannot conspire with its agents. The general rule is that there cannot be conspiracy between a principal and an agent because the acts of the agent are considered in law to be acts of the principal. *See Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill.2d 12, 24 (1998). An exception to the general rule is when the interests of a separately incorporated agent diverge from the interests of the corporate principal and the agent at the time of the conspiracy is acting beyond the scope of his authority or for his own benefit, rather than that of the principal. *See Bilut v. Northwestern University*, 296 Ill. App.3d 42, 49 (1998) (citing *Pink Supply Corp. v. Hiebert*, 788 F.2d 1313, 1317 (8th Cir. 1986)). The second exception is when the agent is acting not as an agent but as a principal, in which case the agent can be liable for conspiring with the principal. *See Bilut*, 296 Ill. App.3d at 49 (citing *Morrison v. Murray Biscuit Co*., 797 F.2d 1430 (7th Cir. 1986)).

Because the constructive members are not actually members of SPP, the Court is unable to conclude that the civil conspiracy claims asserted against them are barred by the Illinois Limited Liability Company Act. By signing the refunding bonds three different times, each of the constructive members were aware that they were required

to refund the distributions due SPP's obligations to Plaintiffs pursuant to the Loan Documents.  The refunding bonds signed by the constructive members expressly state that Plaintiffs may have a claim under the Note and Guaranty to the money being distributed.

However, the Court is unable to conclude that Plaintiffs have proved by clear and convincing evidence that the constructive members were part of a conspiracy to place the Borrower's assets out of the reach of the Lender.  The constructive members may have believed that SPP received equivalent value based on their promise to repay the full amount upon the Plaintiffs obtaining a judgment.  As the Court earlier noted, the constructive members were passive actors.  Because it is unknown precisely whether the constructive members knew of an unlawful purpose or a lawful purpose by unlawful means, the Court concludes that Plaintiffs have not established wrongful conduct sufficient to establish civil conspiracy as to the constructive members.

(2)

The Court does find that Plaintiffs have established by clear and convincing evidence that SPP, EEI and EPM actively participated in and engaged in a concerted action for an unlawful purpose by breaching SPP's contracts with the Plaintiffs. SPP, EEI and EPM were aware that Borrower claimed a right to the rents dating

back to at least April 2013.  Specifically, each of the entities knew because Egizii had major roles with each—as EEI's primary stockholder, as EPM's majority member and he received the Demand Letter sent to SPP.  The evidence showed that other individuals who acted on behalf of the entities—such as Susan Wesp and Vince Toolen—had also seen the Demand Letter and acted pursuant to it.

EEI and EPM ensured that EEI's rent was booked at reduced rates and that EEI occupied 700 North MacArthur without paying any rent at all.  EEI never paid $1 million in rent.  Each collected significant money from SPP after SPP's default. SPP also paid significant funds to EEI's divisions against the rent that EEI owed without ever offsetting the amounts against the rent that EEI owed Borrower.  All of this resulted in less income and more expenses for SPP, which deprived the Plaintiffs of funds to which they were entitled pursuant to the Loan Documents.

Because EEI and EPM were acting for their own benefit to the detriment of SPP, the Court is unable to conclude that the conspiracy claims are barred because of a principal-agency relationship.

The Plaintiffs have established civil conspiracy by clear and convincing evidence as to SPP, EEI and EPM.  The result was those Defendants paid themselves instead of the Plaintiffs in violation of the contracts.  Accordingly, the Plaintiffs are entitled to Judgment on Count VIII as to the civil conspiracy claims asserted against

SPP, EEI and EPM for the amount for which SPP is liable under the terms of the Note.

## III. CONCLUSION

To the extent that Defendants rely on laches, failure to mitigate damages and/or equitable estoppel, the Court finds upon considering all of the evidence that none of those affirmative defenses bar the Plaintiffs' claims.

Under Count I, based on the Court's prior Opinion [d/e 173] and the evidence in the record and pursuant to the terms of the Note, the Court finds that the Plaintiffs are entitled to Judgment against the Borrower in the amount of $31,380,470.40, plus $7,093.82 per diem through the date of Judgment, plus interest at the federal rate thereafter.  EEI and EPM are jointly and severally liable for those amounts as alter egos of SPP.

Under Count II, pursuant to the terms of the Note, the Court finds that SPP is liable for $2,771,917.45 in post-default rental income that was not delivered to Plaintiffs.

Counts III and IV are asserted solely against Defendant Robert W. Egizii.  The proceedings are stayed against Defendant Egizii pursuant to his bankruptcy filing.

The claims pursuant to the Illinois Limited Liability Act in Count V were previously dismissed.

Under Count VI, the Court finds that Borrower committed constructively fraudulent transfers in the amount of $708,790.64 based on distributions to the constructive members without having received reasonably equivalent value. The constructive members are not liable for constructive fraud. The Court is unable to find that SPP's other transfers constituted constructive fraud. Moreover, the Court did not consider any claims that were not asserted in the original complaint.

Under Count VII, the Court is unable to find by clear and convincing evidence that the Borrower and Members committed actual fraud.

Under Count VIII, the Court finds that SPP, EEI and EPM are liable for civil conspiracy. The Court does not find by clear and convincing evidence that the other Defendants are liable for civil conspiracy.

The tortious interference with contractual rights claims asserted against EEI in Count IX were dismissed prior to trial.

Ergo, the Clerk will enter Judgment in favor of Plaintiffs and against Defendant Springfield Prairie Properties, LLC, on Count I in the amount of $31,380,470.40, plus $7,093.82 per diem since March 28, 2013, through the entry of Judgment, plus interest at the federal rate thereafter.

As to Count I, Judgment will also be entered against Defendants EEI Holding Corporation and Egizii Property Managers, LLC, who are jointly and severally liable

as alter egos of Springfield Prairie Properties, LLC, in the amount of $31,380,470.40, plus $7,093.82 per diem since March 28, 2013, through the date of Judgment, plus interest at the federal judgment rate thereafter.

The Clerk will enter Judgment in favor of Plaintiffs and against Defendant Springfield Prairie Properties, LLC, on Count II in the amount of $2,771,917.45.

Because of the stay as to the continuation of any judicial proceeding against Defendant Robert W. Egizii, no Judgment will enter as to Counts III and IV.

The claims asserted in Count V were previously dismissed.

The Clerk will enter Judgment in favor of the Plaintiffs and against Defendant Springfield Prairie Properties, LLC, on Count VI in the amount of $708,790.64.

The Clerk will enter Judgment in favor of the Defendants and against the Plaintiffs as to Count VII.

As to Count VIII, the Clerk will enter Judgment in favor of the Plaintiffs and against Defendants Springfield Prairie Properties, LLC, EEI Holding Corporation and Egizii Property Managers, LLC, jointly and severally, in the amount of $31,380,470.40, plus $7,093.82 per diem since March 28, 2013, through the entry of Judgment, plus interest at the federal rate thereafter.

The claims asserted in Count IX were previously dismissed.

The Clerk will also enter Judgment pursuant to the Order [d/e 28] allowing the Motion to Dismiss of Defendants Londrigan, Potter & Randle, P.C., Perkins Coie, Scott & Scott, P.C. and Sgro, Hanrahan, Durr & Rabin.

Upon entry of Judgment, the Clerk will terminate this case.

IT IS SO ORDERED.

ENTER: March 15, 2021

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge